

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-17-00112-CV

_____

TOMMY YOWELL; GAIL YOWELL; HARRY GRAFF; EL TERCIO, LLC; AND
CASUARINA INVESTMENTS, LLC (D/B/A LAR RESOURCES, LLC),
APPELLANTS

V.

GRANITE OPERATING COMPANY AND APACHE CORPORATION, AND
PAC PRODUCTION CO.; MESA OIL & GAS CORP.; AND CATTALO, LTD.,
APPELLEES

AND

GRANITE OPERATING COMPANY AND APACHE CORPORATION, APPELLANTS

V.

PEYTON ROYALTIES, L.P.; BAILEY PEYTON, INDIVIDUALLY AND AS TRUSTEE
OF THE GEORGE BAILEY PEYTON, IV 2007 GRANTOR RETAINED ANNUITY
TRUST NO. 1; AND PEYTON HOLDINGS CORP., APPELLEES

On Appeal from the 31st District Court
Wheeler County, Texas
Trial Court No. 12,944, Honorable Steven R. Emmert, Presiding

July 26, 2018

## OPINION

Before CAMPBELL and PIRTLE and PARKER, JJ.

This is a multi-party appeal in a multi-issue oil and gas case. The trial court determined that an "anti-washout" provision in a mineral assignment did not extend an overriding royalty interest to new leases. The court also determined that a stock purchase and sale agreement did not require the sellers (who owned the leases) to indemnify the buyers in litigation over the anti-washout provision. We affirm the judgment of the trial court.

Background

Tommy Yowell, Gail Yowell, Harry Graff, El Tericio, LLC, and Casuarina Investments, LLC (collectively, the "Yowell Group"), are successors-in-interest to an overriding royalty interest which was reserved by Aikman Oil Corp. when it assigned certain mineral leases to Jay Haber in 1986. Upland Resources, Inc., eventually acquired the Aikman leases, which covered three-fourths of a section in Wheeler County, Texas, subject to the reservation of the overriding royalty interest. In May of 2007, Amarillo Production Company ("APC") obtained top leases covering the same minerals. Claiming that Upland's leases had terminated due to cessation of production, APC filed suit against Upland in August of 2007.

APC and Upland settled the lawsuit two months later. As part of the settlement, Upland agreed to release its interest in the underlying leases. APC agreed to assign its top leases to Upland's designee, although APC retained a five percent overriding royalty interest. Upland and APC also agreed to an apportionment of liability in the event the Yowell Group sued to enforce its overriding royalty interest. After releasing its interest in the underlying leases, Upland changed its name to Granite Operating Company

2

("Granite"). APC assigned the top leases to Granite. Some years later, Granite assigned the top leases to Apache Corporation ("Apache").

While the APC lawsuit was pending in 2007, Cordillera Energy Partners III, LLC, entered into a Stock Purchase and Sale Agreement to buy the stock of Upland from Bailey Peyton and the Peyton Trust. The agreement included an indemnification provision for Peyton and the Peyton Trust to indemnify Cordillera and Upland from certain "adverse consequences" arising from Upland's litigation with APC. The sale closed in 2007, around the same time the APC lawsuit was settled.

In 2013, the Yowell Group filed this lawsuit to establish that the overriding royalty interest they owned in the underlying leases had attached to APC's two top leases, and that the defendants wrongfully refused to pay them any proceeds on such interest. The named defendants were Granite and Apache, which owns Cordillera and the 2007 top leases (collectively "Granite/Apache").

Granite/Apache, as third party plaintiffs, then sued PAC Production Co., Mesa Oil & Gas Corporation, and Cattalo, Ltd. (collectively, the "PAC Group") and Peyton Royalties, L.P., Bailey Peyton, Individually and as Trustee of the George Bailey Peyton, IV 2007 Grantor Retained Annuity Trust No. 1, and Peyton Holdings Corporation (collectively, the "Peyton Group"), seeking indemnification. The PAC Group filed a counterclaim against Granite/Apache for suspended overriding royalties and filed a cross-action against the Yowell Group seeking a declaration that the overriding royalty interest had terminated.

The parties filed multiple summary judgment motions and cross motions. Relevant to this appeal are the following four motions granted by the trial court: (1) Granite/Apache's motion for summary judgment on the Yowell Group's override claim; (2) the PAC Group's motion for summary judgment against the Yowell Group; (3) the PAC Group's motion for summary judgment against Granite/Apache; and (4) the Peyton Group's motions for summary judgment.

The Yowell Group and Granite/Apache both filed notices of appeal, which we will address in turn.

## The Yowell Group's Appeal

The Yowell Group raises two issues on appeal. It argues, first, that the overriding royalty interest attached to the top leases, and second, that Granite/Apache and the PAC Group did not present sufficient summary judgment evidence to defeat the vesting of the overriding royalty interest.

## Standard of Review

The trial court granted both Granite/Apache's traditional motion for summary judgment on the Yowell Group's override claim, and the PAC Group's motion for summary judgment, which included both traditional and no-evidence grounds, against the Yowell Group. The trial court denied the Yowell Group's competing motion for partial summary judgment.

We review the trial court's summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). In our review, we take as true all

4

evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). When, as here, both sides move for summary judgment and the trial court grants one motion and denies the other, we review both sides' summary judgment evidence, determine all questions presented, and render the judgment that the trial court should have rendered. *See Comm'rs Court of Titus Cty. v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997). When a trial court's order granting summary judgment does not specify the grounds relied on, we must affirm summary judgment if any of the summary judgment grounds are meritorious. *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995).

A movant for traditional summary judgment is entitled to summary judgment only if it conclusively negates at least one element of each of the plaintiff's causes of action, or conclusively establishes each element of an affirmative defense. *Sci. Spectrum, Inc.*, 941 S.W.2d at 911. A no-evidence summary judgment is reviewed under the same legal sufficiency standard as a directed verdict. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750 (Tex. 2000). The task of the appellate court is to determine whether the plaintiff has produced any evidence of probative force to raise fact issues on the material questions presented. The appellate court must consider all evidence in the light most favorable to the nonmovant; every reasonable inference must be indulged in favor of the nonmovant; and any doubts must be resolved in the nonmovant's favor. *See Qantel Business Sys., Inc. v. Custom Controls Co.*, 761 S.W.2d 302, 303–04 (Tex. 1988).

5

Discussion and Analysis

The Nature of the Overriding Royalty Interest

In Texas law, an overriding royalty interest is defined as an interest which is carved out of, and constitutes a part of, the working interest created by an oil and gas lease. *EOG Res., Inc. v. Hanson Prod. Co.*, 94 S.W.3d 697, 701 (Tex. App.—San Antonio 2002, no pet.). It is the share of the oil and gas produced reserved in an assignment, partial assignment, or sublease of an oil and gas lease payable to the assignor by the assignee over and above the royalty reserved in the lease payable to the lessor. *Id.* In its 1986 assignment, Aikman Oil reserved an overriding royalty interest "equal to the difference between twenty-one percent (21.0%) and the total of landowners' royalties, overriding royalties, payments out of production and other lease burdens existing as of this date . . . of all oil, gas and other minerals that may be produced from Subject Leases."

An overriding royalty interest "is necessarily derived from a particular oil and gas lease which constitutes the assignor's mineral estate, and its validity is subject to the terms, conditions and existence of such a lease." *Gruss v. Cummins*, 329 S.W.2d 496, 501 (Tex. Civ. App.—El Paso 1959, writ ref'd n.r.e.). Generally, an overriding royalty interest created by assignment does not survive the termination of the assigned lease unless the instrument creating the interest provides an express provision to the contrary. *See Fain & McGaha v. Biesel*, 331 S.W.2d 346, 348 (Tex. Civ. App.—Fort Worth 1960, writ ref'd n.r.e.). Here, the Aikman assignment included a clause providing for the continuation of the overriding royalty interest, and the Yowell Group's appeal turns on the construction of that provision.

6

The Anti-Washout Clause

Also known as an "evergreen" or "extension and renewal" clause, the "anti-washout" clause[1] aims to impose an overriding royalty interest on any extension or renewal of the leases, or on any future lease of the minerals by Haber:

> Should the Subject Leases or any one of the Subject Leases terminate and in the event Assignee obtains an extension, renewal or new lease or leases covering or affecting all or part of the mineral interest covered and affected by said lease or leases, then the overriding royalty interest reserved herein shall attach to said extension, renewal or new lease or leases; and an appropriate recordable instrument shall be executed to evidence Assignor's overriding royalty interest therein. Further, any subsequent extension or renewal or new lease or leases shall contain a provision whereby such overriding royalty shall apply and attach to any such subsequent extensions or renewal of Subject Leases.

Under the language of the clause, three conditions must occur for the overriding royalty interest to attach to the top leases: (1) one or more of the subject leases terminates; (2) the assignee (Haber or his successor) obtains an extension, renewal, or new lease or leases; and (3) the extension, renewal, or new lease covers or affects all or part of the mineral interest covered and affected by the subject leases.

There is no dispute that the "Subject Leases" (i.e., the 1986 leases in which the Yowell Group's overriding royalty interest was created) terminated. In 2007, APC filed a lawsuit against Upland claiming that the underlying leases had expired due to cessation of production. As part of the settlement of that lawsuit, Upland released its interest in the leases, thereby terminating them. Therefore, we first examine whether Granite/Apache,

---

[1] A "washout" is the "elimination of an overriding royalty or other share of the working interest by the surrender of a lease by a sublessee or assignee and subsequent reacquisition of a lease on the same land free of such interest." WILLIAMS AND MEYERS, *Manual of Oil and Gas Terms* 1340 (8th ed. 1991).

as Haber's successor, obtained an extension, renewal, or new lease. The parties agree that the top leases are not "extensions" of the underlying leases, and we concur. By definition an extension is a "continuation of the same contract for a specified period." *Extension*, BLACK'S LAW DICT. (9th ed. 2009). The top leases did not continue or extend the underlying leases.

Nor were the top leases renewals of the underlying leases. A renewal is the "re-creation of a legal relationship or the replacement of an old contract with a new contract, as opposed to the mere extension of a previous relationship or contract." *Renewal*, BLACK'S LAW DICT. (9th ed. 2009). The top leases here differ from the underlying leases in key respects. Not only did they contain numerous different terms (for example, the royalty clause, rental clause, and surface use and protection covenants differ) but, critically, they were executed by different parties: the top leases were acquired by APC (not Aikman or a successor-in-interest to Aikman) in a separate transaction for which new consideration, in the amount of $251,999.99, was given. Moreover, APC's acquisition of the top leases did not inure to Granite/Apache's benefit, but was in fact adverse to the leasehold title owned by Granite/Apache. *See, e.g., Victory Energy Corp. v. Oz Gas Corp.*, 461 S.W.3d 159, 175 (Tex. App.—El Paso 2014, pet. denied) (a top lease is a contingent proprietary interest in a mineral estate "whose existence is only triggered by the failure of the underlying original lease."). Based on these considerations, we find that the top leases do not constitute "renewals" of the underlying leases. *See Sunac Petro. Corp. v. Parkes*, 416 S.W.2d 798, 803 (Tex. 1967) (holding that new lease was not a renewal of original lease where new lease was executed under different circumstances,

8

for new consideration, upon different terms, and over a year after the expiration of the old lease).

The 2007 APC top leases which Granite/Apache acquired were instruments separate from and independent of the underlying 1986 Aikman leases. We therefore conclude that the top leases are "new leases." The parties do not dispute that these leases cover or affect "all or part of the mineral interest covered and affected by the subject leases," and we agree. Therefore, the three conditions necessary for the overriding royalty interest to attach to the top leases have occurred.

We turn next to the question of whether the anti-washout clause could "attach" to the new/top leases, establishing an enforceable overriding royalty interest in those leases. In their motions for summary judgment, which were granted by the trial court, both Granite/Apache and the PAC Group contended that the clause's attempt to attach to new leases violates the rule against perpetuities ("the Rule") and is therefore void.

The leading case on anti-washout provisions in Texas is *Sunac Petro. Corp. v. Parkes*, 416 S.W.2d 798 (Tex. 1967), in which the Texas Supreme Court examined the effect of a clause that aimed to prolong the life of an overriding royalty interest beyond the original lease. *Id.* at 800. However, in *Sunac*, the clause at issue addressed renewals or extensions of the underlying lease, and did not purport to extend to a new lease. *Id.* As far as we or the parties have determined, this issue, i.e., whether the "new lease" language in the anti-washout clause violates the Rule, is one of first impression for Texas courts.

9

The Rule Against Perpetuities

Perpetuities are prohibited by the Texas Constitution, which provides, "Perpetuities . . . are contrary to the genius of free government, and shall never be allowed . . . ." TEX. CONST. art. I., § 26. Texas has adopted the common law version of the Rule to govern real property conveyances: "[N]o interest is valid unless it must vest, if at all, within twenty-one years after the death of some life or lives in being at the time of the conveyance." *BP Am. Prod. Co. v. Laddex, Ltd.*, 513 S.W.3d 476, 479 (Tex. 2017).

Granite/Apache and the PAC Group assert that the reservation of an overriding royalty interest in future hypothetical leases (here, "new leases" that are not extensions or renewals of existing leases) is not certain to vest within twenty-one years after the death of a life in being at the time of the assignment. We agree.

Under the Rule, a conveyance must be viewed as of the date the instrument is executed, and the interest is void if by any possible contingency the grant or devise could violate the Rule. *Peveto v. Starkey*, 645 S.W.2d 770, 772 (Tex. 1982). The Rule "does not apply to present interests or to future interests that vest at their creation." *Laddex*, 513 S.W.3d at 480. To determine whether the conveyance violates the Rule, we consider the language of the clause: "Should the Subject Leases or any one of the Subject Leases terminate and in the event Assignee obtains an extension, renewal or new lease or leases . . . then the overriding royalty interest reserved herein shall attach to said extension, renewal or new lease or leases."

In order for the reserved interest to attach to a new lease, the underlying lease had to terminate. Therefore, the interest was contingent on the expiration of the existing

10

mineral lease, which was of indefinite duration. In *Laddex*, the Texas Supreme Court explained that this contingency, the expiration or termination of an existing lease, may not occur within twenty-one years after the death of a life in being. *Id.* at 480-81. The Court held, consequently, that an interest in an oil and gas lease that is "contingent on expiration" of an existing oil and gas lease generally violates the Rule. *Id.* at 480.

In *Peveto*, the Court addressed a similar contingent conveyance when it considered the effect of the Rule on a deed which provided: "this grant shall become effective only upon the expiration of [Peveto's] . . . Deed . . . ." *Peveto*, 645 S.W.2d at 772. The Court noted that those words "postpone the vesting of Starkey's interest until some uncertain future date." *Id.* Starkey's springing executory interest could not vest until the prior interest terminated. *Id.* That prior interest, a determinable fee, could continue forever. Therefore, Starkey's interest might not vest within the period of the Rule. The Court held that the deed violated the Rule. *Id.*

Like the interests in *Laddex* and *Peveto*, the Yowell Group's reserved interest in prospective new leases was contingent on the expiration of the underlying lease. The underlying lease was a fee simple determinable lease which provided for a primary term of three years "and as long thereafter as either oil, gas, casinghead gas, condensate, or other minerals or any of them is produced from said land hereunder." The lease was of indefinite duration, with the potential to continue beyond the perpetuities period.

In addition, the interest at issue here depended on the creation of a new lease: the interest would attach "in the event Assignee obtains an extension, renewal or new lease or leases," which was an uncertain contingency. The time between the expiration of the

11

underlying lease and the creation of a new lease to which the overriding royalty interest could purportedly attach is an indeterminate period which could exceed twenty-one years plus a life in being at the time of the assignment. "Executory interests have historically been subject to invalidation by the Rule when they were limited upon conditions precedent not certain [to] occur, if ever, and followed a prior estate not certain to end." *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 2018 Tex. LEXIS 247, at *23 (Tex. 2018). Therefore, we conclude the anti-washout clause's purported creation of an overriding royalty interest in a new lease violates the Rule.

We are mindful of the Yowell Group's claim that their overriding royalty interest was a vested interest as of 1986, when Aikman carved the interest out of the lease, making it valid under the Rule. We disagree with their argument. "Estates are vested when there is a person in being who would have immediate right to the possession of the lands upon the ceasing of the intermediate or precedent estate." *Thornton v. Zea*, 55 S.W. 798, 799 (Tex. Civ. App.—San Antonio 1900, writ ref'd). On the other hand, estates "are contingent [while] the person to whom, or the event upon which they are limited to take effect, remains uncertain." *Id.* The overriding royalty interest Aikman carved out of the underlying lease at the time of his assignment was vested only to the extent that the interest he reserved was an interest in property he owned at the time of the conveyance. There could be no concurrent vesting of title in a new lease which was not then in existence and which might never come into existence. *See Cities Serv. Oil Co. v. Sohio Petro. Co.*, 345 F.Supp. 28, 30–31 (W.D. Okla. 1972) (mem. op.).

We reiterate that an overriding royalty interest is necessarily derived from a particular oil and gas lease, and the lease defines the life and breadth of the estate. *See*

12

*Gruss*, 329 S.W.2d at 501. The overriding royalty interest does not have a life of its own. "The overriding royalty interest is created out of the leasehold estate. Its duration cannot be greater than the leasehold estate, but can be shorter." Bruce M. Kramer, *Royalty Interest in the United States: Not Cut from the Same Cloth*, 29 Tulsa L. J. 449, 457 (1994). The Yowell Group's claim to an overriding royalty is appurtenant to and dependent on the leasehold from which it was carved; Aikman's reservation could not be carved out of, or vested in, a new lease that did not exist at the time of the assignment.

When the underlying lease was terminated, the overriding royalty interest of the Yowell Group also expired, and was not preserved by the anti-washout clause's attempt to secure rights in a new leasehold estate.

Reformation of the Clause

The Yowell Group has urged that, should we find a violation of the Rule, either this Court or the trial court on remand should reform the anti-washout clause so that it does not violate the Rule. The Legislature has called on courts to "reform or construe an interest in real or personal property that violates the [R]ule to effect the ascertainable general intent of the creator of the interest." TEX. PROP. CODE ANN. § 5.043(a) (West 2014). In their motions for summary judgment, Granite/Apache and the PAC Group raised different arguments, which we address in turn, as to why the remedy of reformation is not available to the Yowell Group.

Granite/Apache argues that reformation is not applicable in this case because Section 5.043 does not extend to a non-charitable, commercial instrument, such as the one at issue here. In response to Granite/Apache's challenge to the applicability of

13

Section 5.043, the Yowell Group avers that "Tᴇx. Pʀᴏᴘ. Cᴏᴅᴇ § 5.043 authorizes the Court to reform an instrument to satisfy the Rule, while giving effect to the general intent and specific directive of the parties to the Assignment" and "the Court's ability to reform an instrument is a power inherent power [sic] of a court to which no limitations period is assigned."

We turn to the language of the statute to determine if it allows for reformation of the interest at issue. Section 5.043 "applies to legal and equitable interests, including noncharitable gifts and trusts, conveyed by an inter vivos instrument or a will that takes effect on or after September 1, 1969 . . . ." Tᴇx. Pʀᴏᴘ. Cᴏᴅᴇ Aɴɴ. § 5.043(d). The overriding royalty interest created in the assignment is certainly a legal or equitable interest. The interest was created by reservation in an instrument, "Assignment of Oil, Gas and Mineral Leases," in which Aikman Oil Corp. was the assignor. An "inter vivos instrument" is one that is made during the lifetime of the grantor. *See Inter vivos*, Bʟᴀᴄᴋ's Lᴀᴡ Dɪᴄᴛɪᴏɴᴀʀʏ (9th ed. 2009) (defining "inter vivos" as "[o]f or relating to property conveyed not by will or in contemplation of an imminent death, but during the conveyor's lifetime" and providing Latin translation as "between the living"). As a corporate entity, Aikman Oil Corp. does not have a lifetime. Under the Texas Business Organizations Code, a corporation has a perpetual existence unless otherwise stated in the certificate of formation. *In re ReadyOne Indus., Inc.*, 294 S.W.3d 764, 771 (Tex. App.—El Paso 2009, orig. proceeding) (citing Tᴇx. Bᴜs. Oʀɢ. Cᴏᴅᴇ Aɴɴ. § 3.005(a)(4) (West 2012)). Moreover, we note that the Yowell group has not cited, and we have not found, any case in which Section 5.043 was used to reform a commercial instrument such as this one.

14

We therefore conclude that the assignment from Aikman is not an "inter vivos instrument" subject to reformation under of the statute.

In its motion for summary judgment on the Yowell Group's request for reformation, the PAC Group relied solely on limitations grounds. The PAC Group asserted that a reformation claim is subject to a four-year statute of limitation, citing Texas case law and the residual limitations period set forth in section 16.051 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.051 (West 2015) ("Every action for which there is no express limitations period, except an action for the recovery of real property, must be brought not later than four years after the day the cause of action accrues.").

Here, the Aikman assignment was executed in 1986. Upland's release of the lease and the APC assignment were recorded in November of 2007, giving the Yowell Group constructive notice of potential causes of action. Members of the Yowell Group had actual notice by at least July 3, 2008, that the original lease had been released. The Yowell Group did not file suit until September of 2013, almost six years after they had notice of their claims. More than another year passed before the Yowell Group amended its pleadings, in February of 2015, to request reformation.

The Yowell Group argues that no limitations period applies to reformation under section 5.043 of the Texas Property Code, because the statute "does not create a cause of action for reformation." We are not persuaded by this argument. Even if we view section 5.043 as a "statutory instruction" rather than a cause of action, we are not compelled to deduce that there is no time limit in which to pursue the remedy of

15

reformation. *See Chorman v. McCormick*, 172 S.W.3d 22, 24-25 (Tex. App.—Amarillo 2005, no pet.) ("As a general rule, statutes of limitations apply to actions seeking equitable relief."). Even if we were to assume the Aikman assignment was subject to reformation, we would decline to extend application of Section 5.043 under the facts of this case due to the Yowell Group's delay in requesting such relief.

Therefore, we affirm the trial court's summary judgment in favor of the PAC Group as to the Yowell Group's claims.

## Conclusion as to the Yowell Group's Appeal

Because we conclude the trial court properly granted summary judgment on the grounds that the "new leases" provision violates the Rule, we need not address the other grounds raised by Granite/Apache and the PAC Group in their motions. *See* TEX. R. APP. P. 47.1. Additionally, we have determined that the trial court properly granted summary judgment on the Yowell Group's request for reformation. Therefore, we affirm the trial court's judgment granting Granite/Apache's motion for summary judgment on the Yowell Group's override claims and granting the PAC Group's second motion for summary judgment against the Yowell Group. We affirm the trial court's judgment denying the Yowell Group's first amended motion for partial summary judgment.

## Granite/Apache's Appeal

After the Yowell Group sued Granite/Apache, Granite/Apache brought third party claims against the Peyton Group and the PAC Group. Granite/Apache sued for money had and received, unjust enrichment, and a declaratory judgment. Granite/Apache also

16

alleged the Peyton Group had breached its obligation to indemnify Granite/Apache and sought a declaration that the Peyton Group was obligated to indemnify them.

The trial court granted the Peyton Group's motion for summary judgment, which included both traditional and no-evidence grounds, against Granite/Apache. The trial court also granted the PAC Group's second amended motion for summary judgment against Granite/Apache. The trial court denied Granite/Apache's competing motions for summary judgment.

In the second part of this case, Granite/Apache appeals the trial court's judgment against them on their claims against the Peyton Group. Granite/Apache argues that the trial court erred in (1) rendering judgment that Granite/Apache take nothing on their breach of indemnification claim, and (2) ordering Granite/Apache to pay the Peyton Group $220,396 in attorneys' fees.

Standard of Review

Because this second part of the appeal, like the first, involves competing motions for summary judgment, the de novo standard of review still applies, and we will not repeat it here. *See Agan*, 940 S.W.2d at 81.

17

Discussion and Analysis

The Indemnification Agreement

Granite/Apache alleged the Peyton Group breached the 2007 Stock Purchase and Sale Agreement (SPSA) by failing to indemnify them in the lawsuit brought by the Yowell Group in 2013. The Peyton Group's motion for summary judgment on Granite/Apache's claim asserted that there was no duty for the Peyton Group to indemnify Granite/Apache, or, alternatively, there was no evidence that the Peyton Group breached the SPSA.

The duty to indemnify is determined from the terms of the indemnity agreement. *Ideal Lease Serv., Inc. v. Amoco Prod. Co.*, 662 S.W.2d 951, 953 (Tex. 1983). In construing the indemnity agreement, we must ascertain and give effect to the intentions of the parties as expressed in the instrument. *Id.* Those intentions are determined by applying the same rules of construction as are applied to other contracts. *Id.* Indemnity agreements are strictly construed in order to give effect to the parties' intent. *See Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 423 (Tex. 2000). We give terms in an indemnity agreement their plain, ordinary, and generally accepted meaning. *Lehmann v. Har-Con Corp.*, 76 S.W.3d 555, 562 (Tex. App.—Houston [14th Dist.] 2002, no pet.). An indemnity agreement is unambiguous if it can be given a definite or certain legal meaning, and we will construe an unambiguous indemnity agreement as a matter of law. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).

The SPSA, executed on September 12, 2007, provides that the Peyton Group will indemnify Granite/Apache:

from . . . any Adverse Consequence arising from or in connection with all pending or threatened claims or causes of action asserted against Upland in the litigation styled Amarillo Production Company v. Upland Resources, Inc.[,] Cause No. 12,021, in the 31st District Court in and for Wheeler County, Texas . . . .

The term "Adverse Consequence" was defined as "all actions, awards, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, damages, dues, penalties, fines, costs, reasonable amounts paid in settlement, liabilities, obligations, taxes (including interest thereon), liens, losses, expenses, and fees, including court costs and reasonable attorneys' fees and expenses."

Granite/Apache and the Peyton Group agree there is no ambiguity in the indemnification clause, but they construe it quite differently. Granite/Apache contends that the Yowell Group's lawsuit was the direct consequence of APC's lease-termination claims and therefore triggered the duty to indemnify. The Peyton Group maintains that the Yowell Group's claims do not arise from and are not connected to the "pending or threatened" claims asserted against Upland in the APC lawsuit, so the SPSA does not require indemnity in this case. Since mere disagreement over the interpretation of the clause does not make it ambiguous, we must determine which party's interpretation is correct. *See Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 727 (Tex. 1981).

The phrase "arising from" indicates a causal connection or relation. *See Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004). It may also mean "originating from." *See Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 308 (Tex. 2015); *Lancer Ins. Co. v. Garcia Holiday Tours*, 345 S.W.3d 50, 54 (Tex. 2011). But the indemnification provision at issue here requires more than a

general connection to the litigation. Here, the question is whether the claims brought by the Yowell Group in 2013 arise specifically from the "pending or threatened claims or causes of action asserted against Upland" in the 2007 litigation initiated by APC.

In its suit against Upland, APC alleged that Upland's leases had terminated by their own terms. APC brought claims for trespass to try title, conversion, and debt, seeking to recover for the hydrocarbons Upland had produced after the leases' termination. The Yowell Group's overriding royalty interest in the underlying leases was not at issue; indeed, had APC prevailed on its claims rather than settle them as it has, there would have been no question that the Yowell Group's overriding royalty interest terminated along with the leases. In its lawsuit, the Yowell Group did not bring claims related to the status of the underlying leases or to Upland's decision to settle the APC litigation. Rather, the Yowell Group sought to impose their overriding royalty interest on APC's top leases, which were in effect as a result of the settlement.

Certainly there is some connection between the 2007 litigation—the settlement of which resulted in Granite/Apache's acquisition of APC's top leases—and the lawsuit brought by the Yowell Group to "attach" their overriding royalty interest to those top leases. However, we must give effect to the limiting clause contained within the indemnification. The portion of the indemnity provision requiring that claims arise from "pending or threatened claims or causes of action asserted against Upland" narrows the scope of indemnification. Not only does a narrower reading reflect the words that the parties themselves chose, but it also coincides with the rule to strictly construe indemnity agreements in favor of the indemnitor. *Safeco Ins. Co. of Am. v. Gaubert*, 829 S.W.2d

20

274, 281 (Tex. App.—Dallas 1992, writ denied); *Webb v. Lawson-Avila Constr., Inc.*, 911 S.W.2d 457, 461 (Tex. App.—San Antonio 1995, writ dism'd).

The limitation in the provision requires that, to be covered by the provision, a claim (or other adverse consequence) had to be attributable to the pending or threatened claims against Upland. APC's claims for trespass to try title, conversion, and debt all concerned the status of the underlying leases. And while those claims ultimately created conditions that made the Yowell Group's lawsuit possible, they had nothing to do with whether the Yowell Group's overriding royalty interest could attach to different leases.

We find that the Yowell Group's claims do not arise from the "pending or threatened claims or causes of action asserted against Upland in the litigation styled Amarillo Production Company v. Upland Resources, Inc." Accordingly, we hold the trial court properly granted summary judgment on the Peyton Group's claim that it did not have a duty to indemnify Granite/Apache and did not breach the SPSA by failing to do so. We overrule Granite/Apache's first issue.

Attorneys' Fees

In its second issue, Granite/Apache contends the trial court erred in ordering Granite/Apache to pay the Peyton Group's trial and appellate attorneys' fees.

After granting the Peyton Group's motion for summary judgment, the trial court held a hearing on attorneys' fees. It ultimately ordered Granite/Apache to pay the Peyton Group a total of $220,396 in attorneys' fees. The award was comprised of $130,046.40 for defending against Granite/Apache's claim that the Peyton Group breached the indemnification agreement; $43,500 in contingent appellate attorneys' fees for the same

claim; and $46,849.60 for defending against Granite/Apache's claim for a declaration of proportionate royalty reduction. Granite/Apache contends that each portion of the attorneys' fees award was erroneous.

Granite/Apache first asserts that the Peyton Group is not entitled to the award of $130,046.40 for defending against the breach-of-indemnification-agreement claim because the Peyton Group is not entitled to prevail on that claim. We have already determined that the trial court properly entered judgment in favor of the Peyton Group on Granite/Apache's claims; therefore, the trial court did not err in awarding these attorneys' fees to the Peyton Group.

Granite/Apache next urges that, at a minimum, the Peyton Group is not entitled to recover the $43,500 contingent appellate attorneys' fees award. The award for appellate attorneys' fees was comprised of $22,000 if appealed to this Court and $7,500, $9,000, and $5,000 for petition for review, briefing, and oral argument, respectively, at the Texas Supreme Court. Granite/Apache claims that the Peyton Group's evidence in support of this fee is legally insufficient.

It is "well-settled" that the trial court's award of attorneys' fees may include conditional appellate attorneys' fees. *C & K Invs. v. Fiesta Group, Inc.*, 248 S.W.3d 234, 251 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Under the traditional method of awarding attorneys' fees, "[i]t has consistently been held that an attorney's testimony about his experience, the total amount of fees, and the reasonableness of fees charged is sufficient to support an award." *Metroplex Mailing Servs., LLC v. RR Donnelley & Sons Co.*, 410 S.W.3d 889, 900 (Tex. App.—Dallas 2013, no pet.).

Here, the court had evidence from the Peyton Group's attorney, who testified concerning his experience handling this type of litigation and his familiarity with reasonable fees charged in the Texas Panhandle by attorneys of varying degrees of experience. He also provided testimony concerning each of the *Arthur Andersen* factors, his hourly rate, and the total hours spent on the case so far. *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997) (identifying factors that should be considered in determining reasonableness of a fee). Finally, he testified that, in his opinion, $22,000 would be a reasonable fee for handling the case through an appeal to this Court; $7,500 would be a reasonable fee for handling a petition for review to the Supreme Court; $9,000 would be a reasonable fee for briefing on the merits; and $5,000 would be a reasonable fee for representation through oral argument and completion of proceedings in the Supreme Court.

Granite/Apache argues that this evidence is "based on nothing more than the *ipse dixit* of the witness" and therefore legally insufficient. However, "[a]n attorney's testimony about the reasonableness of his or her own fees is not like other expert witness testimony. Although rooted in the attorney's experience and expertise, it also consists of the attorney's personal knowledge about the underlying work and its particular value to the client." *Garcia v. Gomez*, 319 S.W.3d 638, 641 (Tex. 2010) (noting that opposing counsel may effectively question the attorney regarding the reasonableness of his fee if the matter is truly in dispute). Granite/Apache did not cross-examine the witness regarding his estimates for attorneys' fees on appeal, present any additional evidence on the issue of appellate attorneys' fees, or otherwise contest his testimony on what a reasonable fee would be in the appeal of this case. "A trial court, sitting as finder of fact, may award

attorney's fees as a matter of law based upon an interested witness' testimony if it is accurate, clear, direct, and positive, and not contradicted by any other witness, other evidence, or attendant circumstances . . . ." *French v. Moore*, 169 S.W.3d 1, 15 (Tex. App.—Houston [1st Dist.] 2004, no pet.). We conclude there is sufficient evidence in the record to support the trial court's award of $43,500.00 in conditional appellate attorneys' fees.

In its final challenge to the attorneys' fee award, Granite/Apache asserts that the trial court erred in awarding the Peyton Group $46,849.60 for contesting Granite/Apache's request for declaratory judgment. Granite/Apache argues that, since the declaratory judgment claim was a contingent claim, advanced only "in the event" that the Yowell Group prevailed against Granite/Apache, the trial court should not have awarded attorneys' fees because the contingency never arose. The Peyton Group responds that not all of Granite/Apache's declaratory judgment claims were pleaded in the alternative, forcing the Peyton Group to defend itself against those non-contingent claims.

The trial court's final judgment reflects that the sum of $46,849.60 in attorneys' fees was awarded "in connection with the declaratory judgment asserted against [the Peyton Group] by Granite and Apache regarding the alleged liability for proportionate reduction." The award was not for the declaratory judgment action based on the non-contingent claims regarding indemnity under the SPSA, but rather was for the declaratory judgment action seeking proportionate royalty reduction, which was pleaded as a contingent or alternative claim.

24

In a declaratory judgment action, "reasonable and necessary attorney's fees" may be awarded as are "equitable and just." TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (West 2015); *Allstate Ins. Co. v. Hallman*, 159 S.W.3d 640, 643 (Tex. 2005). A trial court's decision to award attorneys' fees—or not—under this statute is reviewed on appeal for an abuse of discretion. *Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 163 (Tex. 2004). When reviewing matters left to the trial court's discretion, an appellate court may not substitute its judgment for that of the trial judge, and a trial judge does not abuse his discretion merely because he decides a discretionary matter differently than the appellate court would under similar circumstances. *Baylor Univ. Med. Ctr. v. Rosa*, 240 S.W.3d 565, 569 (Tex. App.—Dallas 2007, pet. denied). The test for an abuse of discretion is whether the court acted without reference to any guiding rules and principles. *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). The trial court's ruling should be reversed only if it was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

The plain language of the Uniform Declaratory Judgments Act authorizes a trial court to award attorneys' fees in *any* proceeding under the Act. TEX. CIV. PRAC. & REM. CODE ANN. § 37.009. The statute does not require a judgment on the merits of the dispute as a prerequisite to a fee award. *See Castro v. McNabb*, 319 S.W.3d 721, 735 (Tex. App.—El Paso 2009, no pet.). Under these circumstances, we conclude that Granite/Apache has not demonstrated that the trial court abused its discretion by awarding attorneys' fees to the Peyton Group for its defense of Granite/Apache's declaratory judgment action. We overrule Granite/Apache's second issue.

## Conclusion as to Granite/Apache's Appeal

We have determined that the trial court properly granted summary judgment on the Peyton Group's motion for summary judgment against Granite/Apache and we have overruled Granite/Apache's issues challenging the trial court's award of attorneys' fees.

## Conclusion

We affirm the judgment of the trial court.

Judy C. Parker
Justice

Pirtle, J., dissenting.