# IN THE SUPREME COURT OF TEXAS

═══════════

No. 18-0841

═══════════

TOMMY YOWELL, ET AL., PETITIONERS,

v.

GRANITE OPERATING COMPANY AND APACHE CORPORATION, ET AL., RESPONDENTS

═══════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE SEVENTH DISTRICT OF TEXAS

═══════════

**Argued January 9, 2020**

JUSTICE BUSBY delivered the opinion of the Court.

This dispute over the continuing validity of an interest in a mineral lease requires us to decide issues regarding the rule against perpetuities, the scope of an indemnity agreement, and recovery of appellate attorneys' fees. Among the two petitions, there are four issues presented: (1) whether a reserved overriding royalty interest (ORRI) in a lease that includes an anti-washout provision extending the interest to new leases violates the rule against perpetuities (the Rule); (2) whether Texas Property Code section 5.043 mandates judicial reformation of a commercial instrument creating a property interest that violates the Rule; (3) whether an indemnity agreement covers a particular suit; and (4) whether sufficient evidence supports the appellate attorneys' fees awarded. The court of appeals held the ORRI in new leases violated the Rule and was not subject

to reformation under the Property Code. The court further held that the indemnity agreement was not invoked and evidence supported the award of attorneys' fees.

We hold that the ORRI is a real property interest that violates the Rule and must be reformed, if possible, in accordance with section 5.043 of the Property Code. We therefore reverse the court of appeals' judgment in part and remand for that court to consider whether the ORRI in new leases may be reformed to comply with the Rule, as well as any other grounds for summary judgment it did not reach. We affirm the court of appeals' judgment in part on the issues of indemnity and attorneys' fees.

## BACKGROUND

### A.     The 1986 Lease and ORRI

Aikman Oil Corporation leased the mineral rights in a section of land in Wheeler County in 1986 (1986 Lease). Aikman later assigned its interest in the 1986 Lease to Jay Haber, reserving a 2.25% ORRI[1] for itself. The ORRI reservation was subject to an anti-washout provision that purported to cover any extension, renewal, or new lease executed by Haber or his successors in interest. Through a series of conveyances, petitioners (collectively, the Yowells) obtained Aikman's reserved ORRI in the 1986 Lease, and Upland Resources Inc. obtained Haber's leasehold interest in the 1986 Lease.

---

[1] An ORRI is a non-possessory "share of either production or revenue from production (free of the costs of production) carved out of a lessee's interest under an oil-and-gas lease." *Overriding Royalty*, BLACK'S LAW DICTIONARY (11th ed. 2019). "An overriding royalty interest is a non-participating interest. A royalty owner has no right and thus no ability to go onto the underlying property and drill or otherwise take action to perpetuate a lease." *Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 155 (Tex. 2004).

2

**B.      The 2007 Lease, lawsuit, and settlement**

In May 2007, Amarillo Production Company executed a top lease[2] (2007 Lease) with the same mineral owner and covering the same property as the 1986 Lease. Just three months later, Amarillo Production sued Upland, alleging that Upland's 1986 Lease terminated and Amarillo Production's 2007 Lease went into effect. The parties resolved their dispute with a settlement agreement that (1) terminated Upland's 1986 Lease, (2) initiated Amarillo Production's 2007 Lease, (3) assigned Amarillo Production's new leasehold interest to Upland, and (4) reserved ORRIs in the 2007 Lease for both Amarillo Production (3%) and Upland's owner the Peyton Group (2%). The ORRIs in the 2007 Lease were subject to proportionate reduction if the Yowells successfully attached their ORRI to the 2007 Lease.

**C.      The Peyton Group sells the lessee and grants an indemnity**

Before settling the Amarillo Production dispute, the Peyton Group was negotiating the sale of Upland's assets to Cordillera Energy Partners III, LLC, which was itself later purchased by Apache Corporation. Cordillera, concerned about the then-pending litigation between Amarillo Production and Upland, required indemnity for itself and Upland because its purchase of Upland's assets would bring with it all the potential liability associated with the 2007 Lease dispute. Cordillera and the Peyton Group executed a sales agreement in which the Peyton Group agreed to indemnify both Cordillera and Granite Operating Company—Upland's new corporate identity. For clarity, we refer to Granite, Upland, and Apache collectively as "Granite."

---

[2] A top lease is "[a] lease granted on property already subject to an oil-and-gas lease. Generally, any rights granted by a top lease . . . are valid only if the existing lease ends." *Top Lease*, BLACK'S LAW DICTIONARY (11th ed. 2019).

**D.     The lessee stops paying the Yowells overriding royalties**

Following these transactions and assignments, Granite owned Amarillo Production's leasehold interest in the 2007 Lease, subject to a 5% ORRI reservation. Amarillo Production later conveyed its portion of the reserved ORRI to the PAC Group. As a result, the 2007 Lease was subject to the Peyton Group's 2% ORRI and the PAC Group's 3% ORRI.

In light of this new ownership structure for the lease of the Wheeler County property, Granite refused to continue paying the Yowells overriding royalties pursuant to the 1986 Lease, despite the Yowells' demands. Granite took the position that the 2007 Lease negated any obligation it had to pay the Yowells because their ORRI in the 1986 Lease did not continue to the 2007 Lease.

**E.     History of this suit**

The Yowells sued Granite to vindicate their royalty interest, seeking a judicial declaration of ownership and recovery of payments owed. Granite sued the Peyton Group and the PAC Group, seeking indemnity from liability in the Yowells' suit. The PAC Group filed a counterclaim against Granite—which had suspended ORRI payments under the 2007 Lease—as well as a cross-claim against the Yowells to recover attorneys' fees and to declare the Yowells did not own an ORRI in the 2007 Lease. All parties filed motions for summary judgment, agreeing on a comprehensive stipulation of facts.

The trial court denied the Yowells' motion for partial summary judgment and request for declaratory relief, and granted Granite's and the PAC Group's motions for summary judgment, which were based on the Rule and other grounds. The trial court also granted summary judgment for the Peyton Group and the PAC Group, rejecting Granite's indemnity claim. Following a bench

trial on the Peyton Group's request for attorneys' fees from Granite, the court awarded the Peyton Group $220,396.

A divided court of appeals affirmed, disagreeing on whether the trial court erred in "dispos[ing] of this dispute, as a matter of law, based upon the rule against perpetuities and then dismiss[ing] consideration of the [reformation statute]." 557 S.W.3d 794, 810 (Tex. App.—Amarillo 2018) (Pirtle, J., dissenting). The majority held that the Yowells' reserved ORRI violated the Rule, the assignment of the leasehold interest was not an inter vivos instrument subject to reformation under Property Code section 5.043, the statute of limitations would bar reformation regardless of section 5.043's applicability, the Peyton Group was not required to indemnify Granite, and the evidence supported the attorneys' fees awarded to the Peyton Group from Granite. *Id.* at 802–09. The Yowells petitioned for review of the adverse summary judgment on their claims. Granite filed a conditional cross-petition challenging the denial of its indemnity claim against the Peyton Group and the award of attorneys' fees to the Peyton Group.

ANALYSIS

I.      **The Yowells' reservation of an ORRI in new leases is a property interest that violates the Rule.**

One of the grounds on which Granite and the PAC Group moved for summary judgment was that the Yowells' ORRI under the 2007 Lease violated the Rule. The trial court granted their motions and invalidated the ORRI, simultaneously denying the Yowells' competing motion for partial summary judgment against Granite. We review the trial court's summary judgment rulings de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). We take as true all evidence favorable to the nonmoving party, indulging every reasonable inference and resolving any doubts in its favor. *Id.* When both parties move for summary judgment, each party

5

bears the burden to establish that it is entitled to judgment as a matter of law. *City of Garland v. Dall. Morning News*, 22 S.W.3d 351, 356 (Tex. 2000).

The Texas Constitution prohibits perpetuities: "Perpetuities and monopolies are contrary to the genius of a free government, and shall never be allowed . . . ." TEX. CONST. art. I, § 26. A perpetuity is a restriction on the power of alienation that lasts longer than a prescribed period. *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 866–67 (Tex. 2018). Our common law defines this period for real property conveyances, providing that "no [property] interest is valid unless it must vest, if at all, within twenty-one years after the death of some life or lives in being at the time of the conveyance." *Peveto v. Starkey*, 645 S.W.2d 770, 772 (Tex. 1982). If a grant or devise could violate the Rule at the time the conveyance instrument is signed, the interest conveyed is void. *Id.* If an instrument is open to two constructions, we do not declare the interest void because it can be assumed safely that the grantor intended to make a legal conveyance. *Kelly v. Womack*, 268 S.W.2d 903, 906 (Tex. 1954).

The Rule does not apply to present property interests or to future interests that vest at the time of their creation. *BP Am. Prod. Co. v. Laddex, Ltd.*, 513 S.W.3d 476, 480 (Tex. 2017) (citing *Womack*, 268 S.W.2d at 905–06). "We have held that the typical oil and gas lease in Texas, which grants a lessee the right to explore and develop for a fixed term of years and as long thereafter as minerals are produced, creates in the lessee a fee simple determinable in the mineral estate that does not violate the Rule." *Koopmann*, 547 S.W.3d at 867 (citing *Rosson v. Bennett*, 294 S.W. 660, 662 (Tex. 1927)).

### A. The Yowells' ORRI is both a property and a contract right.

The Rule is implicated only if the Yowells' ORRI under a new lease is an interest in property. *See id.* at 867. Granite argues that because neither Granite's predecessor lessee (Haber) nor the Yowells' predecessor ORRI holder (Aikman) owned the mineral estate at the time they contracted to reserve an ORRI payable under future leases, those original parties could not create any property interest in future leasehold estates. According to Granite, the Yowells have only a contract right to sue Granite for failure to comply with its obligation to execute an appropriate recordable instrument evidencing the Yowells' ORRI following Granite's acquisition of the 2007 Lease.[3]

We therefore consider a preliminary question: do the Yowells have a property interest that could be subject to the Rule? If the Yowells have merely a contract right, the Rule cannot apply and the Yowells' only form of recovery is a claim for breach of contract. If the Yowells' interest is also a property right, however, the Rule can apply and seeking a declaration of ownership is appropriate.

We conclude the Yowells have a property interest under the 2007 Lease that could be subject to the Rule.[4] An ORRI is a share of production created and paid out of a lessee's interest under an oil and gas lease. *See supra* note 1. We have long held that ORRIs, like other royalty

---

[3] This argument is surprising, as Granite chose to move for summary judgment on the ground that the Yowells' ORRI in future leases is a property interest invalidated by the Rule. Granite cannot defend its victory on that motion by arguing that the Yowells have no property interest to which the Rule can apply. *See Stiles v. Resolution Tr. Corp.*, 867 S.W.2d 24, 26 (Tex. 1993) ("[A] summary judgment cannot be affirmed on grounds not expressly set out in the motion or response.").

[4] To be sure, we recognize that the Yowells also have a contract right. The Yowells declined to pursue a claim for breach of contract in this Court. These characterizations are not, however, mutually exclusive, and the Yowells are not precluded from seeking a declaration of property ownership merely because they could have also pursued a claim for breach of contract.

interests in production, are non-possessory property interests. *See State v. Quintana Petroleum Co.*, 133 S.W.2d 112, 114–15 (Tex. 1939) (citing *Tennant v. Dunn*, 110 S.W.2d 53, 57 (Tex. [Comm'n Op.] 1937) (rejecting the argument that ORRI did not create an interest in land)).[5] Yet Granite argues that because a lessee is not certain to obtain a future lease, it has no vested property interest under that lease and any reservation or conveyance of an ORRI that extends to a future lease is purely contractual. We disagree.

As we have observed, parties may agree to extend an ORRI beyond the lifetime of a lease. *See Apache Deepwater, LLC v. McDaniel Partners, Ltd.*, 485 S.W.3d 900, 905 (Tex. 2016) ("Thus, in the case of a single lease, an overriding royalty . . . will not survive termination of the leasehold it burdens *unless the parties have expressly agreed otherwise*." (emphasis added)); *Sunac Petroleum Corp. v. Parkes*, 416 S.W.2d 798, 804 (Tex. 1967) ("*Normally*, when an oil and gas lease terminates, the overriding royalty created in an assignment of the lease is likewise extinguished." (emphasis added)). Granite agrees that an ORRI retains its character as a property interest when it extends to the renewal of a lease, and it offers no reason why that character would not also carry forward when the ORRI extends to a new lease made to the same lessee or its successor. In each case, the ORRI holder and the lessee cannot agree among themselves that a renewal or new lease will be granted; that executive right is retained by the lessor as the reversionary owner of the mineral interest. But they can agree that if the lessee or its successor obtains a renewal or new lease covering the same property, the ORRI holder or its successor will continue to own a share of production from that property payable out of the lessee's interest. This

---

[5] *See also Minchen v. Fields*, 345 S.W.2d 282, 287–88 (Tex. 1961) (observing that *Tennant* and *Quintana Petroleum* settled Texas law "to the effect that an oil payment of the ordinary type which undertakes either to reserve or to grant a title to a fractional share of the oil or of the leasehold estate, or which provides for a delivery of this share of the production in kind to the payee, creates a present interest in land in the payee").

conclusion is not unique to ORRIs; non-participating royalty interests (NPRIs)—shares of production payable out of the lessor's reserved royalty under a lease—can also change depending on the execution and terms of future leases. *See Luckel v. White*, 819 S.W.2d 459, 464 (Tex. 1991).

In sum, whether the ORRI is extended and in what form—as a share of production under a renewed lease or under a new lease involving the same land and parties—will be contingent on a leasing decision by the lessor, a non-party to the ORRI. But that contingency does not deprive an ORRI that continues under a new or renewed lease of its character as a property interest. *See El Dorado Land Co. v. City of McKinney*, 395 S.W.3d 798, 800–01 (Tex. 2013) (holding right to repurchase property upon occurrence of contingency was an estate in land, not merely a contractual right). Rather, the contingency means that the part of the ORRI extending to future leases was not vested at the time of its creation, which gives rise to the perpetuities problem we address below. For these reasons, we conclude the Yowells obtained a property interest under the 2007 Lease and are permitted to seek a judicial declaration regarding the continued validity of that interest.

**B.     The Yowells' interest in new leases did not vest at the time of its creation.**

To determine whether the Yowells' property interest under new leases violates the Rule, we ask two questions. First, did the property interest vest at the time of its creation? *Laddex*, 513 S.W.3d at 480. If the answer is yes, our analysis is complete and the Rule does not apply. *Id.* If the answer is no, we ask a second question: must the interest vest, if at all, within the Rule's prescribed timeframe? *Peveto*, 645 S.W.2d at 772. If the answer to that question is yes, then the interest does not violate the Rule and is valid. *Id.* If the answer is no, the interest violates the Rule. *Id.*

As to the first question, the owner of an interest must have "an immediate, fixed right of present or future enjoyment" for that interest to vest. *Koopmann*, 547 S.W.3d at 867 (citing *Vest*, BLACK'S LAW DICTIONARY (10th ed. 2014)). For example, a mineral interest owner's possibility of reverter upon the expiration of a lease is not subject to the Rule because it is a future interest that vests at the time of its creation. *Id.* "A possibility of reverter is the grantor's right to fee ownership in the real property reverting to him if the condition terminating the determinable fee occurs," and it is vested because it is "a claim to property that the grantor never gave away." *Id.* (cleaned up). A partial alienation of a grantor's possibility of reverter does not violate the Rule, even when another plausible interpretation of the same conveyance results in vesting of the same interest being dependent on the expiration of an existing lease. *Laddex*, 513 S.W.3d at 482.

If an interest can vest only "upon the happening of a condition or event," then it is an executory interest. *Koopmann*, 547 S.W.3d at 867. "An executory interest is a future interest, held by a third person, that either cuts off another's interest or begins after the natural termination of a preceding estate." *Id.* "Executory interests have historically been subject to invalidation by the Rule when they were limited upon conditions precedent not certain [to] occur, if ever, and followed a prior estate not certain to end." *Id.* at 871.

Applying these principles to the Yowells' ORRI, we conclude their interest in new leases did not vest at the time of its creation and is an executory interest to which the Rule applies. The instrument reserving an ORRI under the 1986 Lease provides:

> Should the Subject Leases . . . terminate and in the event Assignee [the lessee] obtains an extension, renewal or new lease or leases covering or affecting all or part of the mineral interest covered and affected by said lease or leases, then the overriding royalty interest reserved herein shall attach to said extension, renewal or new lease or leases; and an appropriate recordable instrument shall be executed to evidence Assignor's [the ORRI holder's] overriding royalty interest

10

> therein. Further, any subsequent extension or renewal or new lease or leases shall contain a provision whereby such overriding royalty shall apply and attach to any subsequent extensions or renewal of Subject Leases.

In addition, the instrument "shall inure to the benefit of and shall be binding upon the parties hereto, both Assignor and Assignee, their respective heirs, successors, legal representatives and assigns."

At the time this ORRI was reserved, it provided no immediate, fixed right of present or future enjoyment as to new leases because those leases were not yet in existence. Rather, the ORRI would not apply to a new lease unless the following additional events occurred: (1) the 1986 Lease terminated; (2) the lessor granted a new lease covering all or part of the same mineral interest; and (3) the new lease was obtained by a successor of Haber, the lessee at the time of the reservation.

Moreover, Aikman and Haber were lessees. Because neither was a lessor holding the possibility of reverter and the right to re-lease the Wheeler County property, neither could agree to create a vested future interest in production under new leases. Their interest is not derived from a lessor's partial alienation of his possibility of reverter, as the interest we upheld in *Laddex* was. *Cf.* 513 S.W.3d at 480. Although this lack of ownership does not deprive the interest of its character as an interest in property, as explained above, it does prevent the interest from vesting immediately upon its creation.

The Yowells argue that Aikman's intent was to create only one ORRI that vested at its creation. As evidence of this intent, they point to the reservation's provision that the ORRI shall attach to new leases. In the Yowells' view, the ORRI does not require re-vesting upon the termination of the 1986 Lease. We disagree that the parties may avoid a Rule violation by including automatic attachment language.

11

"Parties are free to contract for whatever division of the interests suits them. Their intent . . . controls." *Wenske v. Ealy*, 521 S.W.3d 791, 797 (Tex. 2017) (construing deed according to the parties' intent as expressed in the deed's language). Although this principle may have aided the Yowells in a claim for breach of contract, the Yowells chose not to pursue such a claim in this Court. Instead, the Yowells sought a judicial declaration that their reserved ORRI was a property interest under the 2007 Lease. Even assuming the parties intended to avoid a Rule violation by including language automatically attaching their interest to new leases, that interest simply could not vest in new leases that did not exist and that the parties to the reservation lacked the ability to create.

We rejected a similar argument in *Koopmann*. There, Strieber granted fee simple title to the Koopmanns, reserving a one-half NPRI for a primary term of fifteen years and "as long thereafter as there [was] production in paying . . . quantities." 547 S.W.3d at 863. The Koopmanns argued their future right to Strieber's NPRI "'vested in interest' immediately upon execution of the deed." *Id.* at 868. We disagreed, holding that "because at the time of the grant the executory limitation on Strieber's interest—lack of production in paying quantities—might not happen within twenty-one years after the death of some life or lives in being," the Koopmanns' interest was uncertain, constituted an executory interest, and "violated the Rule." *Id.*[6] The Yowells face the same reality: their interest in new leases did not vest at the time Aikman and Haber created that interest because its existence depends on the occurrence of the three uncertain events discussed above.

---

[6] *Koopmann* went on to hold that the interest was not void, however, because it did not violate the purpose of the Rule—an issue we address below. 547 S.W.3d at 868, 873.

12

The Yowells' position gains no support from *Independent Gas & Oil Producers, Inc. v. Union Oil Co. of Cal.*, 669 F.2d 624 (10th Cir. 1982). There, the court imposed Union's ORRI on a second lease executed after the termination of the original lease. *Id.* at 628. The court held that "Union's property interest in any *renewals or extensions* of Lease I vested at the time of its assignment . . . and the [Rule] is not operable in such a situation." *Id.* (emphasis added). We agree with the Tenth Circuit's conclusion that Union's ORRI in *renewals or extensions* did not violate the Rule. *See Sunac*, 416 S.W.2d at 802–03 (discussing lease extensions and renewals). Whether an ORRI reservation in *new* leases violates the Rule was not addressed in *Union Oil.*[7]

The Yowells also cannot benefit from *Luecke v. Wallace*, which they cite for the proposition that a royalty interest under a lease not yet in existence vests at the time of its creation because "the royalty-interest owner [has] a *present* right to a share of future production." 951 S.W.2d 267, 274 (Tex. App.—Austin 1997, no writ). We agree with this proposition for royalties payable out of the mineral estate owner's share of production, but the same is not true for ORRIs payable out of the lessee's share of production. In *Luecke*, Wallace reserved an NPRI that remained with the land irrespective of the lease's lifetime. *Id.* at 270. Luecke owned the remainder of the mineral estate subject to Wallace's interest. *Id.* Luecke challenged the validity of Wallace's interest on the ground that Wallace's reservation violated the Rule. *Id.* at 272. The court of appeals correctly rejected this argument because Wallace's reservation vested at the time she created the interest. *Id.* at 274. Irrespective of who later leased from Luecke, those minerals were subject to Wallace's interest. *See id.*

---

[7] Although the Yowells view the 2007 Lease as—in substance—a renewal, they concede that our decisions categorize it as a new lease. *See Sunac*, 416 S.W.2d at 802–03 (defining lease renewals narrowly). We therefore need not address the distinction between the renewal or extension of a lease, on the one hand, and the creation of a new lease, on the other.

13

In contrast, an ORRI holder's rights are subject to the lease's survival according to the parties' agreement. The holder of an ORRI under potential future leases does not have a guaranteed, present right to a share of future production; in this way, an ORRI differs from other royalty interests and cannot be presently vested at the time it is created. We conclude the language used in the Aikman-to-Haber assignment reserving an ORRI under future leases postponed the interest's vesting and subjected the reservation to the Rule's timeframe parameters.

### C.     The Yowells' interest is not certain to vest within twenty-one years after some life in being.

Because the Yowells' ORRI under new leases did not vest at the time of its creation, we move to the second step of the Rule's analysis, asking whether the interest must vest, if at all, within twenty-one years after the death of some life in being at the time of the reservation. *Peveto*, 645 S.W.2d at 772. We conclude the answer is no because the Yowells' ORRI in new leases is contingent on three events that may not occur within the Rule's timeframe.

First, for the Yowells' interest in a new lease to vest, the existing lease must terminate. More specifically, the Yowells' ORRI in the 2007 Lease cannot become effective until the 1986 Lease terminates. The 1986 Lease's secondary term extends the lease "as long thereafter as either oil, gas, . . . or other mineral . . . is produced from said land hereunder." So long as that lease produced the covered minerals in paying quantities, it could continue indefinitely. At the time the ORRI was reserved, there was no certainty the Yowells' interest in a future lease would ever vest, let alone within the Rule's parameters. *See Laddex*, 513 S.W.3d at 480 (holding that an interest "contingent on [the] expiration of a determinable-fee bottom lease, without more, generally violates the Rule").

14

Second, for the interest in a new lease to vest, the mineral interest owner with the executive right to execute a new lease must actually sign a new lease—an event that may never happen. When a lease terminates, fee ownership of the mineral interest reverts to the lessor, who has the right to lease the minerals to another developer. *See Koopmann*, 547 S.W.3d at 867. Even if the 1986 Lease were certain to terminate within the Rule's timeframe, which it is not, the mineral owner's decision to sign a new lease is not certain to occur, let alone within the Rule's parameters. This contingency "postpone[s] the vesting of [the Yowells'] interest until some uncertain future date" and violates the Rule. *Peveto*, 645 S.W.2d at 772.

Third, for the interest in a new lease to vest, that lease must be obtained by a successor of Haber, the lessee at the time of the reservation.[8] That event is never certain to occur, and it could occur long after any new lease is signed—for example, if the lease were granted to a third party that later sold its interest to a successor of Haber. The Yowells' ORRI in new leases therefore violates the Rule.

**D.      The Rule's purpose supports invalidating the Yowells' interest in new leases.**

When an interest violates the Rule, we typically hold that the provisions of the instrument creating it are void. *Koopmann*, 547 S.W.3d at 868. We have declined to invalidate such an interest, however, when doing so would not serve the purpose of the Rule. *Id.* at 868–69.

In *Koopmann*, as noted above, Streiber conveyed land to the Koopmanns, reserving a one-half NPRI for fifteen years and as long thereafter as there was production in paying quantities. *Id.* at 863. After the Koopmanns executed a lease, but nearing the expiration of Streiber's fifteen-year

---

[8] As the Yowells concede, their interest in new leases cannot bind parties not privy to the agreement reserving the ORRI.

primary term, Streiber conveyed more than half of her NPRI to the Koopmanns' lessee in an effort to incentivize the lessee to begin drilling before Streiber's interest expired. *Id.* No such drilling occurred to save the NPRI held by Streiber and the lessee. *Id.* at 863–64.

The lessee argued that Streiber's reservation created a future interest in the Koopmanns that was not certain to vest within the Rule's timeframe, so the Koopmanns' interest was void. *Id.* at 864. We agreed the Koopmanns had an executory interest that only vested once production ceased. *Id.* at 868. That interest was not certain to vest within the Rule's timeframe, which supported holding that the Koopmanns' interest violated the Rule. *Id.*

Nevertheless, we held the Koopmanns could keep their interest because the Rule's purpose would not be served by invalidating it. *Id.* at 872. We highlighted "dissatisfaction with the harshness of [the Rule's] application," which had "resulted in significant statutory modifications," and noted another instance in which we opted not to invalidate an interest because it did not "constitute an unreasonable restraint on alienation." *Id.* at 868–69 (citing *Cherokee Water Co. v. Forderhause*, 641 S.W.2d 522, 526 (Tex. 1982)).

We explained that the Rule's purpose is to prevent "landowners from using remote contingencies to preclude alienability of land for generations." *Id.* at 869 (citing *Kettler v. Atkinson*, 383 S.W.2d 557, 560 (Tex. 1964)). "[R]estraint on alienability and promoting the productivity of land is not at issue in the oil and gas context," however. *Id.* We held that because Streiber's interest "was certain to end, either because production in paying or commercial quantities ceased . . . or the recoverable minerals were exhausted," the Koopmanns' interest was more akin to a vested remainder. *Id.* at 871. "It [was therefore] appropriate to hold that in this oil and gas context, where a defeasible term interest is created by reservation, leaving an executory

16

interest that is certain to vest in an ascertainable grantee, the Rule does not invalidate the grantee's future interest." *Id.* at 873.

We limited *Koopmann*'s holding "to future interests in the oil and gas context in which the holder of the interest is ascertainable and the preceding estate is certain to terminate." *Id.* This holding does not apply to the Yowells' interest in new leases, which is subject to multiple contingencies not certain to occur.

Like the Koopmanns' interest, the Yowells' interest in new leases is an executory interest because it is conditioned upon the "natural termination of a preceding estate." *Id.* at 867. The expiration of the 1986 Lease is not certain to occur at all, much less within the Rule's "twenty-one years after the death of some life or lives in being." *Peveto*, 645 S.W.2d at 772. If the natural termination of the 1986 Lease were the only contingency, *Koopmann* would support validating the Yowells' executory interest.

In order for the Yowells to attach their interest to the 2007 Lease, however, additional remote contingencies beyond the natural termination of the 1986 Lease must occur. Not only must the mineral owner execute another oil and gas lease but one of Haber's successors must also obtain that lease. These are the sort of remote and uncertain contingencies the Rule seeks to prevent. In *Koopmann*, we outlined a narrow exception for validating an interest even when it violates the Rule. Because the Yowells' interest in new leases is subject to a triple contingency, it falls outside the *Koopmann* exception.

*     *     *

The Yowells' ORRI in new leases was not vested at the time of its creation and is contingent on at least three events that may not happen at all, let alone within the lives in being plus twenty-one years stipulated by the Rule. This interest therefore violates the Rule.

## II. Texas Property Code section 5.043 requires courts to reform property interests that violate the Rule when possible.

Because we agree with the court of appeals that the Yowells' ORRI violates the Rule, we must next decide whether Texas Property Code section 5.043 can be applied to reform the reservation in order to comply with the Rule.[9] The court of appeals declined to apply this statute, holding it does not reach commercial instruments and that, in any event, its use would be barred by the residual four-year statute of limitations. 557 S.W.3d at 804–05. We disagree and hold that section 5.043 is a judicial mandate to which limitations does not apply, and it requires reformation of commercial instruments creating property interests that violate the Rule.

Section 5.043 provides:

(a) Within the limits of the rule against perpetuities, a court shall reform or construe an interest in real or personal property that violates the rule to effect the ascertainable general intent of the creator of the interest. A court shall liberally construe and apply this provision to validate an interest to the fullest extent consistent with the creator's intent.

(b) The court may reform or construe an interest under Subsection (a) of this section according to the doctrine of cy pres by giving effect to the general intent and specific directives of the creator within the limits of the rule against perpetuities.

(c) If an instrument that violates the rule against perpetuities may be reformed or construed under this section, a court shall enforce the provisions of the instrument

---

[9] As a preliminary matter, we reject Granite's assertion that the Yowells waived their statutory reformation argument by failing to brief the argument adequately in the court of appeals. The Yowells' brief requested that the court of appeals (or the trial court on remand) utilize the reformation statute if it concluded the ORRI reservation in new leases violated the Rule.

18

that do not violate the rule and shall reform or construe under this section a provision that violates or might violate the rule.

(d) This section applies to legal and equitable interests, including noncharitable gifts and trusts, conveyed by an inter vivos instrument or a will that takes effect on or after September 1, 1969 . . . .

TEX. PROP. CODE § 5.043.

### A. The reformation statute extends to instruments other than trusts and wills.

Granite first argues that to qualify for reformation under the statute, the instrument must be either a trust or will. We disagree. Section 5.043 "applies to legal and equitable interests, including noncharitable gifts and trusts." *Id.* § 5.043(d). The phrases "'includes' and 'including' are terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded." TEX. GOV'T CODE § 311.005(13). Granite's argument that the statute applies only to gifts conveyed in a trust or will is unpersuasive because the statute merely provides examples of what constitutes a "legal or equitable interest." The statute does not preclude reformation of other types of legal and equitable interests.

### B. Corporations can make inter vivos conveyances.

Next, Granite contends the court of appeals correctly held the statute inapplicable because Aikman's reserved ORRI was not created in an "inter vivos instrument." PROP. CODE § 5.043(d). The court of appeals reasoned that because Aikman is a corporation and does not have a "lifetime" in the traditional sense, it can create only commercial instruments. 557 S.W.3d at 804. The court interpreted "inter vivos instrument" to require that the conveying party have a true lifetime for the reformation statute to apply, noting that a corporation's perpetual existence is shortened only if

19

stated in its certificate of formation. *Id.* We disagree with the court of appeals' conclusion for three reasons.

First, corporations can execute inter vivos instruments—trusts, for example. The Property Code articulates different methods a "property owner" may use to create a trust. PROP. CODE § 112.001. One method is "a property owner's inter vivos transfer of the property to another person as trustee for the transferor or a third person." *Id.* § 112.001(2). Although this provision does not define either "property owner" or "person," we know from other sections of the Property Code that a "settlor" is a "*person* who creates a trust." *Id.* § 111.004(14) (emphasis added). And both the Property Code and the Code Construction Act define "person" to include a corporation. *See id.* § 111.004(10)(B) (defining person to include a corporation); GOV'T CODE § 311.005(2) ("'Person' includes corporation, organization, government or governmental subdivision or agency, business trust, estate, trust, partnership, association, and any other legal entity."). Thus, a corporation can be a settlor that creates a trust by an "*inter vivos transfer* of [its] property." *See* PROP. CODE § 112.001(2) (emphasis added).

Because a corporation can make an inter vivos conveyance of property to create a trust, we decline to hold that the Legislature's choice of the term "inter vivos" excludes corporate conveyances of property interests from the reformation statute. The court of appeals erred when it declined to reform a commercial instrument executed by Aikman—a corporation—on the ground that it lacked the ability to create an inter vivos instrument. 557 S.W.3d at 804.[10]

---

[10] We do not suggest, however, that a corporation conveying an unvested interest could be used as a measuring life in applying the reformation statute. "At common law, a corporation did not qualify as a life in being." *Am. Nat. Res., LLC v. Eagle Rock Energy Partners, L.P.*, 374 P.3d 766, 771 (Okla. 2016) (citing RESTATEMENT (FIRST) OF PROP. § 374, cmt. h (AM. LAW INST. 1944)).

20

Second, the statute requires courts to "liberally construe and apply [it] to validate an interest to the fullest extent consistent with the creator's intent." PROP. CODE § 5.043(a). This directive weighs against "a strained or narrow construction" of the statute that would exclude virtually all commercial transactions. *Kroger Co. v. Keng*, 23 S.W.3d 347, 349 (Tex. 2000) ("Because we should liberally construe the Workers' Compensation Act in favor of the injured worker, a strained or narrow construction of section 406.033 would be improper."). The exclusion of commercial instruments from reformation is inconsistent with the statutory command to carry out the intent of an instrument's creator as fully as possible.

Third, the amendment history of section 5.043 is informative. The Legislature enacted the reformation statute in 1969, providing that the "Act shall apply *only* to inter vivos instruments and wills taking effect after the Act becomes effective." Act of June 12, 1969, 61st Leg., R.S., ch. 693, § 4, 1969 Tex. Gen. Laws 2020, 2020 (emphasis added). In 1983, the Legislature removed the word "only" from the statute's text. Act of May 26, 1983, 68th Leg., R.S., ch. 576, § 1, 1983 Tex. Gen. Laws 3475, 3484 (codified at PROP. CODE § 5.043(d)). Granite notes correctly that the Legislature's deletion of the word "only" in 1983 was not intended to be a substantive change. *See* PROP. CODE § 1.001(b)(4). But we have said before that "every word excluded from a statute must also be presumed to have been excluded for a purpose." *City of Richardson v. Oncor Elec. Delivery Co.*, 539 S.W.3d 252, 260 (Tex. 2018) (quoting *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981)). The removal of the word "only" confirms that subsection (d) is an instruction on how to apply the statute prospectively, not a scope limitation on the types of instruments it covers.

**C.      The reformation statute is not subject to a four-year statute of limitations.**

The court of appeals offered a second reason for refusing to apply section 5.043: the Yowells' "delay in requesting [reformation] relief."  557 S.W.3d at 805.  The court believed the four-year residual statute of limitations should apply to the reformation statute.  *See id.* at 804–05 (citing TEX. CIV. PRAC. & REM. CODE § 16.051 ("Every action for which there is no express limitations period, except an action for the recovery of real property, must be brought not later than four years after the day the cause of action accrues.")).  We disagree.

Reformation under section 5.043 is not an "action" to which the residual statute of limitations would apply.  Rather, the Legislature enacted a remedial mandate for courts to reform interests, like the one in this case, that violate the Rule.  The plain language of subsection (a) supports this conclusion:

> Within the limits of the rule against perpetuities, a court *shall* reform or construe an interest in real or personal property that violates the rule to effect the ascertainable general intent of the creator of the interest.  A court *shall* liberally construe and apply this provision to validate an interest to the fullest extent consistent with the creator's intent.

PROP. CODE § 5.043(a) (emphasis added).  The Legislature's purposeful use of the word "shall" throughout the provision imposes a duty on courts to reform or construe property interests that violate the Rule.  *Id.*; GOV'T CODE § 311.016(a)(2).  The provision's language shows it is an instruction to courts on how to remedy a violation of the Rule, not a cause of action subject to a statute of limitations.

The PAC Group asserts it is settled that actions for reformation are subject to a four-year statute of limitations.  It also cites authority for a prohibition on reforming deeds due to the four-year statute of limitations in actions for breach of contract.  But no party has pursued a cause of

22

action for either reformation or breach of contract in this Court. As we have explained, the Yowells' ORRI is a real property interest, and they seek a judicial declaration of ownership of that interest in the 2007 Lease. It is Granite and the PAC Group that asserted the Yowells' interest violates the Rule, and the reformation statute simply addresses the remedy for such a violation.

For these reasons, we conclude section 5.043 applies to corporate conveyances and is not subject to a four-year statute of limitations. We therefore reverse the portion of the court of appeals' judgment that affirmed the trial court's summary judgment rulings on the Yowells' claim against Granite and the PAC Group's cross-claim against the Yowells. The parties disagree, however, about whether—and, if so, how—the Yowells' interest in new leases can be reformed under the statute to reflect the creator's intent within the limits of the Rule. We remand for further proceedings on this issue and any other grounds for summary judgment the court of appeals did not reach.

## III. The Peyton Group was not obligated to indemnify Granite because the parties' agreement limited the scope of indemnification.

Turning to the cross-petition, Granite contends the trial court erred in rejecting its claim— on cross-motions for summary judgment—that the Peyton Group breached its contractual obligation to indemnify Granite from the Yowells' suit. Courts must construe indemnity agreements according to the normal rules of contract construction. *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 423 (Tex. 2000). Each party to a contract bargains for superior language, and the Court's primary concern is "to ascertain and to give effect to the intentions of the parties as expressed in the instrument." *Ideal Lease Serv., Inc. v. Amoco Prod. Co.*, 662 S.W.2d 951, 953 (Tex. 1983). Furthermore, the Court may not "expand the parties' rights or responsibilities beyond the limits agreed upon by them in the contract." *Id.* Instead, courts are to construe indemnity

23

agreements strictly in order to give effect to the parties' intent as expressed in the agreement. *Gulf Ins. Co.*, 22 S.W.3d at 423. "[P]hrases should have different meanings," and parties may negotiate the language of a contractual provision to expand or limit its scope. *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004).

The indemnity agreement provides that following Cordillera's purchase of Granite, the Peyton Group will indemnify both Cordillera and Granite from "any Adverse Consequence arising from or in connection with all pending or threatened claims or causes of action asserted against [Granite] in the litigation" regarding the termination of the 1986 Lease and the beginning of Amarillo Production's 2007 Lease. We have held that the phrase "arise out of" simply requires showing a causal connection or relation, which is a standard on the spectrum for establishing causation. *Mid-Century Ins. Co. of Tex. v. Lindsey*, 997 S.W.2d 153, 156 (Tex. 1999). The phrase can also mean "originating from," which is a similarly low threshold for establishing a causal link. *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 308 (Tex. 2015). But when parties narrow the scope of their rights and obligations purposefully, the Court must enforce the terms as expressed within the four corners of the contract. *Id.* at 309 ("[W]hile the phrases 'arising from,' 'with respect to,' and 'attributable to' may seem expansive out of context, the temporal limitations to which they are tied and other contextual clues necessarily narrow their scope and require no less than a substantial-factor relationship."); *see also Utica Nat'l Ins. Co.*, 141 S.W.3d at 203 ("Since the policy used different wording—'arising out of' versus 'due to' in parallel exclusions—we conclude that the phrases should have different meanings in the context of this policy.").

Here, the parties utilized limiting language so that the Peyton Group's obligations rose and fell with the "pending or threatened claims or causes of action asserted against" Granite in the Amarillo Production litigation. There, Amarillo Production sued Granite for trespass to try title, conversion, and debt. 557 S.W.3d at 807. The Yowells were neither a party to that suit nor involved in the pending or threatened claims asserted against Granite at that time. *Id.* Furthermore, the continuing validity of the Yowells' ORRI was never at issue in that dispute, which concerned whether the 1986 Lease ceased to produce oil in paying quantities such that it terminated and Amarillo Production's top lease went into effect. *Id.*

Given the defined scope of the indemnity provision, Granite was required to show more than a general connection between the Amarillo Production litigation and the Yowells' suit against it in order to qualify for indemnity. Because the Yowells' claims against Granite are not connected to claims asserted against Granite in the Amarillo Production litigation, we affirm the court of appeals' judgment that the Peyton Group was not obligated to indemnify Granite for the Yowells' suit against Granite.

## IV. The Peyton Group was entitled to the attorneys' fees awarded.

After granting the Peyton Group's motion for summary judgment against Granite regarding breach of the indemnity agreement, the trial court held an evidentiary hearing on the issue of attorneys' fees by agreement of the parties and awarded the Peyton Group $220,396 in fees from Granite. *Id.* at 807. Granite challenges two components of this award: $43,500 in contingent appellate attorneys' fees on the claim of breach, and $46,849.60 for defending against Granite's claim seeking a declaration of proportionate royalty reduction.

25

When reviewing a trial court's award of attorneys' fees, we must ensure the record contains sufficient evidence to support such an award. *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 505 (Tex. 2019) (concluding the record lacked sufficient evidence to support the trial court's award of attorneys' fees). The party seeking attorneys' fees bears the burden of proof and must supply enough facts to support the reasonableness of the amount awarded. *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 762–63 (Tex. 2012). If there is insufficient evidence in the record to uphold the trial court's award of those fees, we must reverse. *See id.* at 763–64.

## A. The Peyton Group offered sufficient evidence of its contingent appellate fees.

Granite argues the evidence is legally insufficient to support the trial court's award of contingent appellate fees to the Peyton Group.[11] According to Granite, because the Peyton Group's counsel based his testimony on nothing more than *ipse dixit*, the trial court's award of contingent appellate fees should be reversed.

We recently elaborated on the showing an attorney must make to support an award of fees in "any situation in which an objective calculation of reasonable hours worked times a reasonable rate can be employed." *Rohrmoos Venture*, 578 S.W.3d at 498. In these situations, "the fact finder's starting point for calculating an attorney's fee award is determining the reasonable hours worked multiplied by a reasonable hourly rate, and the fee claimant bears the burden of providing sufficient evidence on both counts." *Id.* Such evidence "includes, at a minimum, evidence of (1) particular services performed, (2) who performed those services, (3) approximately when the

---

[11] Granite also argues that because the Peyton Group has an obligation to indemnify Granite under their sales agreement, it is not entitled to attorneys' fees. We reject this argument because, as explained above, the Peyton Group is the prevailing party on the indemnity issue.

services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services." *Id.*

We have not previously addressed how this lodestar analysis may affect the evidence needed to support a contingent award of fees that have not yet been incurred. Granite points us to a court of appeals case citing *El Apple* that required an attorney to establish the reasonableness of contingent appellate fees with the same level of specificity as fees already earned. *See Sentinel Integrity Sols., Inc. v. Mistras Grp., Inc.*, 414 S.W.3d 911, 928–29 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). As we explained in *Rohrmoos Venture*, however, "[i]t should have been clear from our opinion[] in *El Apple*" that the lodestar analysis applies to situations "in which an objective calculation of reasonable hours worked . . . can be employed." 578 S.W.3d at 498.

That is not the situation with respect to contingent appellate fees, which have not yet been incurred and thus must be projected based on expert opinion testimony. *See Ventling v. Johnson*, 466 S.W.3d 143, 156 (Tex. 2015) ("An award of [contingent] appellate attorney's fees to a party is essentially an award of fees that have not yet been incurred . . . ."). At the point when fees are awarded by the trial court, any appeal is still hypothetical. *See id.* There is no certainty regarding who will represent the appellee in the appellate courts, what counsel's hourly rate(s) will be, or what services will be necessary to ensure appropriate representation in light of the issues the appellant chooses to raise.

Of course, this uncertainty does not excuse a party seeking to recover contingent appellate fees from the need to provide opinion testimony about the services it reasonably believes will be

27

necessary to defend the appeal and a reasonable hourly rate for those services.[12] Having independently reviewed the record, we conclude the Peyton Group's uncontroverted evidence met that standard.

### B. The Uniform Declaratory Judgments Act permits an award of fees for defending contingent claims.

Granite also argues that the fees awarded to the Peyton Group under the Uniform Declaratory Judgments Act (UDJA) were impermissible because Granite's claim seeking a declaration of proportionate royalty reduction was not decided by the trial court due to its contingent nature. Granite observes that its claim for royalty reduction would not arise unless the Yowells first prevailed on their claims against Granite, which did not occur in the trial court. Granite contends the Peyton Group should not be awarded fees for defending against such a claim.

The UDJA provides: "In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just." CIV. PRAC. & REM. CODE § 37.009. The plain language of the UDJA authorizes courts to award equitable and just fees in *any proceeding* under the Act; it does not require the trial court to consider or render judgment on the merits of that claim. *Castro v. McNabb*, 319 S.W.3d 721, 735 (Tex. App.—El Paso 2009, no pet.) ("The [UDJA] does not require a judgment on the merits of the dispute as a prerequisite to a fee award.").[13]

---

[12] *See, e.g.*, *Assoun v. Gustafson*, 493 S.W.3d 156, 168 (Tex. App.—Dallas 2016, pet. denied) (holding there was insufficient evidence in the record to support award of contingent appellate fees when there was no testimony that "included an opinion of what a reasonable attorney's fees would be for the services that would be necessary in the event of an appeal"); *State & Cty. Mut. Fire Ins. Co. v. Walker*, 228 S.W.3d 404, 408–10 (Tex. App.—Fort Worth 2007, no pet.) (holding there was sufficient evidence to support the award of appellate attorneys' fees when the attorney testified, without contradiction from opposing counsel, what he believed "a reasonable attorney's fee would be for the services that would 'necessarily need to be rendered' in the event of an appeal").

[13] *See also* *Feldman v. KPMG LLP*, 438 S.W.3d 678, 685 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (adopting *Castro* court's holding that the UDJA does not require a judgment on the merits as a prerequisite to a fee

Granite points to the court of appeals' holding in *EOG Resources, Inc. v. Wagner & Brown, Ltd.*, 202 S.W.3d 338 (Tex. App.—Corpus Christi–Edinburg 2006, pet. denied). The *EOG* court affirmed a trial court's denial of attorneys' fees for a claim pleaded "as a separate and alternative cause of action" because it was not before the trial court due to its contingent nature. *Id.* at 347. But that case applied section 91.406 of the Natural Resources Code, which provides stricter parameters for an award of fees. *Id.*; TEX. NAT. RES. CODE § 91.406. Section 91.406 permits an award of attorneys' fees only "in any final judgment in favor of the plaintiff"; in contrast, the UDJA permits a fee award in "any proceeding" within its purview. *Compare* NAT. RES. CODE § 91.406, *with* CIV. PRAC. & REM. CODE § 37.009. The *EOG* court correctly held that the trial court could refuse to award attorneys' fees pursuant to section 91.406 because the party's alternative claim had not yet resulted in a final judgment. *EOG Res.*, 202 S.W.3d at 348. The UDJA's language is broader, permitting an award of attorneys' fees for defending against a UDJA claim without a final judgment on the merits of that claim. CIV. PRAC. & REM. CODE § 37.009.

We affirm the court of appeals' judgment on the issue of attorneys' fees because there is legally sufficient evidence in the record to support the trial court's award of contingent attorneys' fees, and because the UDJA does not prohibit a trial court from awarding attorneys' fees to a party defending against a contingent claim for declaratory judgment.

## CONCLUSION

We affirm the court of appeals' judgment in part regarding the indemnity agreement and attorneys' fees. We reverse the judgment in part regarding the validity of the Yowells' ORRI and

---

award); *Devon Energy Prod. Co. v. KCS Res., LLC*, 450 S.W.3d 203, 220 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (same); *Zurita v. SVH-1 Partners, Ltd.*, No. 03-10-00650-CV, 2011 WL 6118573, at *8 (Tex. App.—Austin Dec. 8, 2011, pet. denied) (same).

the applicability of the reformation statute.  We remand the case for the court of appeals to consider whether the Yowells' interest can be reformed to comply with the Rule, as well as any other grounds for summary judgment the court did not reach.

_____
J. Brett Busby
Justice

**OPINION DELIVERED:** May 15, 2020