

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00527-CV

_____

JOSHUA EDINGER, Appellant

V.

STILLWATERS POOL COMPANY, LLC, Appellee

On Appeal from County Court at Law No. 2
Tarrant County, Texas
Trial Court No. 2022-006751-2

Before Bassel, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

This dispute began in 2022 between pro se litigants. Appellee Stillwaters Pool Company, LLC (SPC) sued Appellant Joshua Edinger in justice court[1] for $2,171.87, seeking payment for past-due billing for "weekly swimming pool services, motor replacement on filter pump[,] [f]ilter cleans[,] and repair on filter." SPC prevailed, receiving a judgment for $1,428.88, plus court costs and interest, and the justice court dismissed Edinger's counterclaim. Edinger appealed to the county court at law for a trial de novo, at which point SPC hired counsel, but Edinger did not. The county court awarded to SPC $1,993.26 in damages, plus pre- and post-judgment interest, court costs, $2,500 in attorney's fees, and conditional appellate attorney's fees. Edinger has appealed.

In four issues with multiple, overlapping sub-issues,[2] Edinger complains in his pro se appellate brief that the county court's judgment for damages and award of

---

[1] *See* Tex. R. Civ. P. 500.4(b)(1) (allowing a non-lawyer employee, owner, officer, or entity partner to represent an entity in justice court).

[2] Throughout his appellate brief, Edinger raises multifarious complaints about the trial court and the opposing party. "A multifarious point of error is one that raises more than one specific ground of error," *Hartwell v. Lone Star, PCA*, 528 S.W.3d 750, 763 n.10 (Tex. App.—Texarkana 2017, pet. dism'd), contrary to the commands of our procedural rules. *See* Tex. R. App. P. 38.1(f) ("The brief must state *concisely* all issues or points presented for review. The statement of an issue or point will be treated as covering every subsidiary question that is fairly included." (emphasis added)).

attorney's fees to SPC must be reversed. Because Edinger's complaints do not present reversible error, *see* Tex. R. App. P. 44.1, we will affirm.

## II. Background

We set out the following to provide context for most of Edinger's arguments but will address the attorney's-fee evidence separately in our discussion below.

### A. Justice court proceedings

SPC sued Edinger in February 2022, and the court set a June discovery deadline and ordered the parties to exchange their evidence to be used at trial, including all documents, photographs, or other physical evidence; the witnesses, including their relationship to the parties and the subject of their testimony; and their damages-calculation methodology. In July, almost three weeks after the discovery deadline, Edinger moved for leave of court to amend his answer and to assert a counterclaim.

On September 23, 2022, twelve days before trial, Edinger filed his counterpetition. In his counterpetition, Edinger denied the validity or enforceability of the parties' unwritten weekly-pool-cleaning-and-maintenance contract but asserted that if a contract existed, then SPC had breached it; that SPC had made fraudulent representations before and during the parties' relationship; and that SPC had no right to retain the money he had paid under the fraudulent and "heinously breached" agreement. He also sought damages for "loss of use of property," asserting that SPC's failure to provide the agreed-upon pool cleaning and equipment-maintenance services had rendered "a large portion of [his] $1.25 million property unusable for a total of

3

eleven (11) months." However, Edinger neither paid the counterclaim fee nor filed a statement of inability to afford payment of court costs until his de novo appeal to the county court at law. *See* Tex. R. Civ. P. 502.6(a) (stating that to file a counterclaim, a defendant must pay a filing fee or provide a statement of inability to afford payment of court costs). On October 5, 2022, the justice court entered judgment for SPC and ordered Edinger's counterclaim dismissed. Edinger appealed later that month.

## B. County court proceedings

### 1. Pretrial

In March 2023, after hiring counsel, SPC filed an amended petition that included a request for attorney's fees. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.001 (providing for recovery of reasonable attorney's fees if the claim is for—among other things— rendered services, performed labor, or an oral or written contract). To its amended petition, SPC attached as "Exhibit A" the January 1, 2021–November 1, 2021 balance details for Edinger's account.[3] On March 30, 2023, Edinger answered with a general denial.

Over a year later, on September 5, 2024, Edinger moved for a continuance of the September 27, 2024 trial date and sought "to refile filings." In his motion, he alleged that he had discovered that three filings—his amended answer, his counterclaim, and his amended counterclaim—had been rejected on March 29, 2024, because they had

---

[3]SPC also—apparently in an abundance of caution—filed an amended answer with a general denial to Edinger's justice-court counterclaim.

been mistakenly submitted to this court instead of County Court at Law No. 2, and that he had not received the rejection notifications in a timely manner because his company had been undergoing a server migration. He requested additional time to complete discovery and to refile the documents but did not attach an affidavit or unsworn declaration to support his motion. *Cf.* Tex. R. Civ. P. 251.

SPC opposed the continuance on the motion's procedural deficiencies. *See id.* SPC also argued that the motion was not Edinger's first delay attempt and claimed that it would be prejudiced by further delay when Edinger still had time to file his pleadings and had had ample time to conduct discovery on SPC's claims on file and to conduct discovery relating to the pleadings that he had thought he already had on file. To its response, SPC attached the court coordinator's May 6, 2024 email notifying SPC's counsel that Edinger had asked to reset their May 8, 2024 trial date.

On September 6, Edinger filed a combined amended motion for continuance and reply to SPC's response. He attached an affidavit to sponsor documents supporting his "server migration" excuse: technical-support work tickets from December 25–26, 2023, regarding "email configuration"; from April 4–5, 2024, regarding "outgoing email ending in spam"; from April 16–17, 2024, regarding "email deliverability"; and from September 3, 2024, regarding "emails going to spam." He also attached his September 5, 2024 email exchange with support@efiletexas.gov. In that email, sent at 12:27 p.m., Edinger reported that he had tried to change the contact email for his profile but kept receiving an error message, and he received a response at 2:30 p.m., asking him for

information. He attached nothing to show that the issue had or had not been resolved that day.[4]

In his affidavit, Edinger stated that he became aware on September 5, 2024, that his amended answer and counterclaims—which he had filed on March 29, 2024—had been rejected after he spoke with the county court clerk and contacted efiletx.gov. He asserted that his failure to receive timely notifications was entirely due to the technical issues "and not due to any intentional delay on [his] part" and that, without the pleadings being on file, he had been "unable to engage in meaningful discovery." But he did not explain why he had not taken any actions in the case between March 29 and September 5 or why he did not or could not conduct discovery during the period in which he believed that he had counterclaims on file in the county court. Instead, he acknowledged that the case had been "ongoing for nearly two years," and then requested a sixty-day delay so that he could "fully defend against [SPC's] claims and assert counterclaims."[5]

---

[4]The record reflects that Edinger filed his September 5 continuance motion at 2:36 p.m., six minutes after efiletexas support responded to his email.

[5]Edinger further complained that SPC had also previously requested "delays for months due to personal matters, including a vacation." He attached to his amended continuance motion the May 7, 2024 email from SPC's counsel to the court coordinator—after Edinger's last-minute continuance request—in which SPC's counsel stated, "I just received the Order resetting trial for the week of August 13th. [I] am out on family vacation/college enrollment in August. [I] am available for trial anytime starting in September onward."

6

The county court heard and denied Edinger's continuance motions at a September 18, 2024 Zoom hearing. Although we have no reporter's record of the hearing, before the September 27 trial began, the county court recounted that it had admonished Edinger at the Zoom hearing about needing to "educate [himself] on the rules of civil procedure and evidence, and [that] there was time still, then, to file the counterclaim seven days before the date of trial."

Two days before the September 27 trial, at 9:57 a.m., Edinger emailed the county court to complain about e-file problems. Through the court coordinator, the county court responded back to him at 10:53 a.m. with instructions for e-filing and whom to call and to tell him that he "could come down here *and file any documents in person.*" [Emphasis added.] *See* Tex. R. Civ. P. 21(f)(1) (stating that "unrepresented parties may electronically file documents, *but it is not required*" (emphasis added)). At around 2:30 p.m. that day, the county court told Edinger to email the documents that he was trying to e-file so that the county court could "ascertain why he would need a continuance again since the first continuance was denied." Edinger did so on September 26, sending a witness list around 2:30 p.m. and a counterclaim around 3:30 p.m.; none of those documents were filed by Edinger or anyone else.

### 2. Trial

Edinger did not reurge any of his continuance motions before announcing at trial that he was ready to proceed, after which the county court stated that it would not allow any counterclaim because Edinger had not timely filed it despite his having had

time to do so at the time of the September 18, 2024 hearing. The county court noted that by September 25, the counterclaim would not have been timely and noted how long the case had been on file.

### a. Edinger's objections

During SPC's case in chief, Edinger objected to Plaintiff's Exhibit 5, which contained SPC's billing on his account and its invoices to him dated January 7, 2021–November 1, 2021, and showed that during the eleven-month period he had been billed $2,849.26 and had paid $677.39. Edinger objected that these were "in-house generated documents that are non third party verification [sic]" and that they were "self-generated by a party with a vested interest."[6] Edinger wanted to see third-party documentation "such as receipts for a pump replacement, warranties[,] or third-party verification reports" because otherwise the invoices were "essentially self-serving hearsay designed to support [SPC's] claim." He cited the county court to *Kio v. Cyrus USA, Inc.*[7] and *State*

---

[6]The parties pre-admitted by agreement Plaintiff's Exhibit 3 and Defendant's Exhibit 10, which contained SPC's amended petition and the same billing on Edinger's account as the first page in Plaintiff's Exhibit 5.

[7]Edinger also refers to this case in his appellate brief. We have been unable to find it, but we found one with a similar name, *Keough v. Cyrus USA, Inc.*, 204 S.W.3d 1, 2 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (op. on reh'g). However, nothing in *Keough* addressed the admissibility of evidence. *Id.* We cannot tell from Edinger's brief if he used ChatGPT or another artificial intelligence (AI) source to attempt to develop his authorities and arguments. *See* David T. Laton, *A Cautionary Tale of AI as a Research Tool for Lawyers*, 70 No. 1 Prac. Law. 42, 43 (2024) ("ChatGPT currently lacks the ability to produce reliable and accurate results when given a legal query.").

*of Risk Management v. Martinez*[8] for the proposition that "self-serving records unsupported by expert [or] third-party verification can and should be excluded."

Edinger also objected "for the same reasons" to Plaintiff's Exhibit 5-A, which contained SPC's emails to Edinger, and he objected to Plaintiff's Exhibit 6, the June 11, 2021 invoice that SPC had received from a third party for pool motors, because he had requested that information "multiple times." When the county court asked Edinger to show where he had requested the information in Plaintiff's Exhibit 6 in discovery, Edinger replied, "I was denied that, your Honor." To clarify, the county court asked, "So there was no written discovery by you in this case asking for this production?" Edinger said, "No." *Cf.* Tex. R. Civ. P. 196.1(a) (explaining that a party may serve a request for production not later than 30 days before discovery's end).

Edinger also objected to Plaintiff's Exhibit 7, the SPC service sheet showing his pool's filter cleaning on October 25, 2021, and the route sheets, which SPC's operations manager Chris Calkins testified SPC gave to its service technicians "to mark on as they do their pools, and they can [show] any issues that may be going on." Edinger objected to the sheets showing weekly performance, complaining, "[T]his is no different than

---

[8]In his appellate brief, Edinger corrected the case name to "*State Office of Risk Mgmt. v. Martinez*, 539 S.W.3d 266, 277 (Tex. App.—Houston [1st Dist.] 2017, no pet.)." However, the Southwestern Reporter number directs us to an opinion by the supreme court—not the First Court of Appeals—and nothing in the case addresses the admissibility of evidence. *See* 539 S.W.3d 266, 268–78 (Tex. 2017).

9

me investigating myself. . . . If there's no third-party verification[,] I don't think they should be admitted." The county court overruled his objections.

> ### b. Evidence overview

During SPC's case in chief, Calkins testified that the parties had entered into an oral agreement, confirmed by texts,[9] for weekly pool cleaning and maintenance. He stated that Edinger had sent him a text to ask for weekly pool service and repairs and that he had replied with a monthly price. During the defense's case, Edinger offered, and the county court admitted, some of the parties' text messages from December 2020 to October 2021.[10] To provide a clear picture of the parties' relationship, we will review their evidence in its chronological order rather than the piecemeal order in which it was admitted and presented at trial.

All of SPC's monthly invoices to Edinger, from January 7, 2021, to November 1, 2021, (Plaintiff's Exhibit 5) have Edinger's address at the top, along with SPC's contact information; the invoice date; the invoice number; a "P.O. Number" identified as the service month; a "Terms" section, which states, "Due on receipt"; and a service description, price, sales tax, and total amount due. From context, a bill for a month's service issued at the beginning of the next month: the parties' dialogue and the pool

---

[9]During his cross-examination of Calkins, Edinger stated, "Let the record reflect that [Defense] Exhibit 1[-A] is a series of text messages confirming that the Plaintiff promised me these services."

[10]Before Calkins's December 29, 2020 text to Edinger about a cleaning, Edinger sent Calkins his email address, phone number, and address.

10

cleaning began in December 2020, but the first bill is dated January 7, 2021, and SPC discontinued services in November for nonpayment but the November 1, 2021 invoice reflects a weekly-customer-discount filter cleaning that other documents showed had occurred in October.

Most of SPC's invoices show a monthly charge of $178.61 (including tax) for weekly cleaning. The September 1, 2021 invoice listed the wrong amount of sales tax in Edinger's favor, resulting in an invoice for $175.21 instead of $178.61. The April 7, 2021 invoice shows an additional charge for a filter cleaning for $90 "discounted for weekly customers," for a total amount due of $276.04; the July 5, 2021 invoice shows an additional charge for a $35 discounted service call, $15 for parts, and tax, for a total amount due of $226.14; and the November 1, 2021 invoice shows a prorated monthly charge of $123.75 with the notation, "Services were cancelled [on November 21, 2021] due to nonpayment of services," and a charge for a filter cleaning of $90 "discounted for weekly customers," and tax of $17.63. There is a separate June 21, 2021 invoice for a pump motor installation. The invoices for April 7, 2021; July 5, 2021; and September 1, 2021 are marked "PAID." None of the other invoices bear the "PAID" marking.

### c. April 2021 pool condition

A point of dispute was the pool's condition in April 2021. During Edinger's case in chief, the county court admitted two photos of the pool, which Edinger testified he had taken on April 24, 2021, and on April 29, 2021.

11

Defendant's Exhibit 1-B, an April 24, 2021 text exchange between Calkins and Edinger, contained the following from Edinger to Calkins: "Hey brother. Hope all is well. Just wanted to touch base. We hadn't seen you guys in a couple of weeks and wanted to make sure everything was ok." Calkins replied, "As far as I'm aware we've been each week. We've had storms last 2 Fridays and quite a few windy days[,] so pools haven't been staying very clean. The pool would be looking like a pond if we missed 2 weeks." Approximately thirty minutes later, Calkins added, "[The service technician] was there today, said the cleaner doesn't seem to be working. Lots of dirt went in pool from storm. Brushed pool walls down, got debris out. Will need to be vacuumed. I'll put the cleaner on my list to come check out." Edinger replied, "Awesome, thanks for the update. I think it may need some shock cause it's looking a little green. Just fyi." Calkins responded, "He added chemicals as well."

Although the evidence showed that SPC continued to provide service after April, during his case in chief, Edinger testified that he did not have to fire SPC to avoid paying because SPC had been in material breach, stating, "I'm not an attorney, but I've been forced to do enough reading this week to know that there's definitely been a material breach." He compared printouts from SPC's website, contained in Defense Exhibit 7, which showed "emphatically clean pools," with his April 2021 pool photos and asked, "[D]oes this look beautiful to you? Or better yet, would someone allow their children to swim in this?" He asked, "If you're cleaning weekly, how is my pool getting progressively worse? How is this not false advertisement?"

12

During cross-examination, SPC's counsel asked Edinger if he was saying that the pool was not usable at all during the entire time that SPC was cleaning it. Edinger replied, "I'm out of the state most of the time. My girlfriend would be the one that would have to attest to that, because she stays home with the kids most of the time." SPC's counsel then followed up by asking, "Your testimony as to whether the pool was or wasn't usable the entire 11 months, it's based on what your girlfriend was telling you?" Edinger replied, "And my kids. And my own experience, because those pictures I took." Edinger complained, "We are in court right now because [SPC's] employees are on the honor system and don't show up for their work." He insisted that he was not obligated by Texas law to cancel the contract because "Texas law basically states that if he's not performing, then I don't have to perform." And he stated that he did not cancel the contract but rather "was canceled when [SPC] no showed." Although the county court informed Edinger that he could call his girlfriend as a witness, Edinger declined.[11]

---

[11]Before trial began, the county court swore in Edinger's girlfriend, and when SPC's counsel finished cross-examining Edinger, the county court told Edinger he could call her to testify. Edinger then told the county court, "[S]he spoke to me in the hallway and I'm a witness, like, I'm just honoring what you said, witnesses can't talk to each other and she talked to me, so I told her I couldn't call her." The county court explained, "She can talk to you because you are the party acting as your own attorney. So do you want to call her or not?"

13

### d. June 2021 pump motors

Another point of dispute was the parties' agreement to install pump motors in June 2021. Defendant's Exhibit 1-E contains June 10, 2021 texts between Calkins and Edinger in which Calkins told Edinger that his pump had a bad motor and that a new motor on the existing pump would be $640 "including tax and installation." Edinger replied, "No prob. Can you shoot me an invoice. My insurance will cover it. Thanks." Calkins responded, "Yes. That's awesome! Most don't let [a] homeowner[']s pool company [d]o the work[,] and they just slap a rebuilt motor in. I should be able to get back by late today or first thing in morning tomorrow. Tomorrow [would] be better so I can get pool vacuumed up too." Edinger replied, "That works. Thank you[,] sir."

Plaintiff's Exhibit 6 is the June 11, 2021 invoice from Pool Water Products to SPC, showing two "Motor 2HP SQ FL THD 230V" at $206 each ($412 total), and Plaintiff's Exhibit 5 contains SPC's June 21, 2021 invoice to Edinger for $690.22 for "motor change," with a description matching the Pool Water Products invoice: "2 HP square flange pump motor," plus "[S]haft seal. Labor and Materials. 1 year warranty," and sales tax of $40.22. Defendant's Exhibit 1-D contains Edinger's June 24, 2021 text to Calkins to which Edinger attached two photos and stated, "Pretty sure this seal cracked[; i]t's got a slow leak, and pumps keep stopping/starting."

The last reference to the June 2021 pump replacement occurred in the August 4–5, 2021 texts between Calkins and Edinger in Defendant's Exhibits 1-G and 1-H. Edinger replied to Calkins's recommendation for replacing the waterfall pump,

14

stating, "I actually thought you sent me the requested invoice to show the price and we passed?  So the one on the left controls the snake?  Cause that was the original reason we inquired about pricing on the pump, and it hasn't moved an inch for months now. Let me know.  Thanks."  Calkins responded that he would stop by the following day, listed reasons why the pool's suction cleaner might not be moving, noted the "motor change on the filter pump a few months ago," and stated, "You said go ahead, that your insurance would reimburse you."

### e.  Other evidence of the parties' relationship

Defendant's Exhibit 1-I is an August 7, 2021 text in which Calkins explained to Edinger the four choke points on a suction cleaner.  Plaintiff's Exhibit 5-A contains Calkins's August 13, 2021 email to Edinger in which Calkins stated, "Need to get caught up on these payments ASAP.  Let me know if you need me to resend any of the invoices."

Defendant's Exhibit 1-J contains Calkins's August 14, 2021 and August 16, 2021 texts to Edinger.  In the first, Calkins asked Edinger to check the pressure and stated, "If it's at or close to 30 already we will need to do a filter clean.  It was down to 20 after I backwashed on the 7th.  Might [need] to super shock yours this week.  That knocked the yellow out of one of my other pools."  In the text two days later, Calkins stated,

> Pressure was high already, backwashed again, it's holding at 20 currently.
> Looks like during heavy rains the flowerbeds dump into the pool, which
> will mess the pool up chemically and equipment wise.

15

Putting some non float mulch would help keep dirt in the beds and not in the pool. Dirt will cause filter to clog up and phosphates to rise which is the food for the Algae.

Going to super shock it so don't use the pool today. Might need to clean filter by end of the week[;] suppose[d] to get more rain this week. So filter will probably load back up.

Defendant's Exhibits 1-K and 1-L are October 14, 2021 texts from Calkins to Edinger and an October 20, 2021 text from Edinger to Calkins in the same conversation. In the first October 14, 2021 message, Calkins stated,

Mynor[12] asked me to do the pool this week. Found system on service mode?

When I primed pool up its now shooting D.E. into pool. Won't have time to get to filter issue today. Possibly tomorrow. Just going to focus on getting pool cleaned today.

Account is pretty behind as well. I'll send a summary of account this evening. Need to get it paid up asap. Thanks.

In the second message, around an hour later, Calkins stated,

I'll be back tomorrow to clean filter and vacuum pool. Pressure went right back up to 30 after a backwashing. It's the flowerbed dirt that is causing the filters to load up. That dirt sticks to the fabric on grids and doesn't release during backwashing. Deck drains can't keep up with the draining once the drain covers get covered with mulch and leaves then it dumps it into the pool.

---

[12]Calkins testified that Mynor was one of SPC's service technicians. Plaintiff's Exhibit 7 contained Mynor's pay sheets showing that Edinger was on his Wednesday route until Edinger "cancelled service 12/1." SPC's invoices, which show billing a month behind service, reflect that Edinger was not billed for any of Mynor's weekly cleanings that occurred in November.

16

Edinger stated in his October 20, 2021 response, "Hey brother. Never heard back from you, but I saw today that water was shooting out of the side of the filter housing so I put it in timeout. Just fyi." Calkins replied, "I talked to your wife each time I was there. I'll come take a look. Pool was looking good on Saturday when I came to check on it." Plaintiff's Exhibit 7 contains a filter clean billed to Edinger on October 25, 2021, with Calkins listed as the installer.

Plaintiff's Exhibit 5-A contains a November 8, 2021 email to Edinger from Calkins, informing him that SPC needed a check for the balance "by the end of the week," and advising him that SPC could not carry account balances like his. Calkins gave him the option of putting a credit card on file for monthly charging after invoicing and stated that otherwise, without monthly payment, SPC "will have to discontinue the pool services."

## III. Discussion

Edinger challenges the admissibility and legal sufficiency of the evidence to support the damages and attorney's-fee award and challenges the dismissal of his counterclaims without a hearing on the merits. Most of his complaints revolve around what he describes as SPC's "unreliable, unverified, and in-house-generated documents."

### A. One set of rules for all litigants

We first note that to ensure fairness in our treatment of all litigants, pro se litigants are held to the same standards as licensed attorneys and must comply with all

17

applicable laws and procedural rules. *Barcroft v. Walton*, No. 02-16-00110-CV, 2017 WL 3910911, at *5 (Tex. App.—Fort Worth Sept. 7, 2017, no pet.) (mem. op.).

## B. Edinger's overlapping issues and sub-issues

Because Edinger's issues and sub-issues overlap, we have consolidated them under their respective standards of review.

### 1. Abuse-of-discretion issues

In portions of his first three issues, Edinger complains about the county court's improper admission of SPC's evidence and the improper exclusion of his own evidence. We review these complaints for an abuse of discretion, *see Fleming v. Wilson*, 610 S.W.3d 18, 21 (Tex. 2020), and must uphold the lower court's evidentiary ruling if the record shows any legitimate basis for it, *see Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

Likewise, in portions of his fourth issue, Edinger argues that the county court erroneously dismissed his counterclaims, but docket management is another area of wide discretion with which we will not interfere on appeal absent a showing of clear abuse. *See Clanton v. Clark*, 639 S.W.2d 929, 931 (Tex. 1982). In his fourth issue's remainder, he complains about the denial of his requested continuances, which we also review for an abuse of discretion. *See Hale v. Hale*, No. 02-23-00234-CV, 2024 WL 4510195, at *4 (Tex. App.—Fort Worth Oct. 17, 2024, pet. denied) (mem. op.).

18

### a. Authentication and admissibility

Edinger complains that the county court improperly relied upon SPC's "discredited logs" to award damages and upon SPC's "internal route sheets and invoices," which allowed employees to self-certify their work and thus "violate[d] the standards of trustworthiness required for business records under Texas Rule of Evidence 803(6)." He asserts that Calkins admitted under oath that there was no third-party oversight, GPS verification, or independent quality control, incentivizing false entries in those logs and undermining SPC's billing credibility and that the county court's reliance on these documents "violated well-established evidentiary standards under *Formosa Plastics Corp.* [*USA*] *v. Presidio Engineers & Contractors*, 960 S.W.2d 41 (Tex. 1998)[(op. on reh'g),] and *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812 (Tex. 1997)[ (op. on reh'g)]."

We will begin with Edinger's case citations, which—like the cases to which he cited the county court—do not stand for the propositions he argues. *Cf.* Tex. R. App. P. 38.1(i) (requiring a brief to contain "appropriate citations to authorities").

The supreme court did not address business-records authenticity or admissibility in *Formosa*. *See* 960 S.W.2d at 43. Instead, that case addressed whether the respondent had "a viable fraud claim when it suffered only economic losses related to the performance and subject matter of the parties' contract." *Id.* at 44, 47. The court was also asked to consider whether there was legally sufficient evidence to support the $700,000 damages award for fraud. *Id.* at 44, 49–50 (holding that as to lost profits from

19

fraud under the benefit-of-the-bargain measure,[13] testimony based on an entirely hypothetical, speculative bargain that was never struck and would not have been consummated was insufficient to support the award). *Formosa*'s circumstances were completely different from the instant case, in which Calkins testified that the parties had agreed to weekly service at a monthly charge, and Edinger implicitly agreed that the parties had a contract when he testified that he was "not obligated by Texas law to cancel the contract."

In *Formosa*, the court cited *Arthur Andersen* regarding Texas's out-of-pocket and benefit-of-the-bargain measures of damages for common law fraud. *Id.* at 49 (citing *Arthur Andersen*, 945 S.W.2d at 817). *Arthur Andersen*, an accounting malpractice case in which the plaintiff sued for Deceptive Trade Practices Act (DTPA) violations, fraud, negligence claims, and breach of implied warranty, has no bearing on the admissibility questions presented here. 945 S.W.2d at 814–16 (discussing DTPA concerns).

We understand Edinger's underlying complaint to be that the county court could not rely on SPC's business records. But under Rule of Evidence 902(10), business records are self-authenticating and require no extrinsic evidence of authenticity to be

---

[13]The case before us is for breach of contract. In a contract case, the general rule for measuring benefit-of-the-bargain damages is to calculate the difference between what was promised—i.e., $178.61 per month in exchange for weekly pool cleaning plus additional amounts for extra maintenance, service, and parts—and what was received. *See MSW Corpus Christi Landfill, Ltd. v. Gulley-Hurst, L.L.C.*, 664 S.W.3d 102, 106 (Tex. 2023). The goal of contract damages "is to put the plaintiff back to the position it would have been in had there been no breach." *White Knight Dev., LLC v. Simmons*, No. 23-0868, 2025 WL 1668348, at *4 (Tex. June 13, 2025).

admissible as long as the original or a copy of the record meets the requirements of Rule 803(6) and is accompanied by an affidavit that complies with Rule 902(10)'s form and service requirements.[14] Tex. R. Evid. 902(10); *H2O Sols., Ltd. v. PM Realty Grp., LP*, 438 S.W.3d 606, 622 (Tex. App.—Houston [1st Dist.] 2014, pet. denied).

Rule 803(6) states that a record of a regularly conducted activity is not excluded as hearsay if it was made at or near the time by—or from information transmitted by—someone with knowledge; it was kept in the course of a regularly conducted business activity; making the record was a regular practice of that activity; all of the conditions are shown by the testimony of the records' custodian or another qualified witness or by an affidavit or unsworn declaration that complies with Rule 902(10); and "the opponent fails to demonstrate that the source of the information or the method or circumstances of preparation indicate a lack of trustworthiness." Tex. R. Evid. 803(6). Lack of trustworthiness is most frequently found when the record was prepared in anticipation of litigation. *Harpst v. Fleming*, 566 S.W.3d 898, 910 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

In support of SPC's business records in Plaintiff's Exhibit 5—account balance details, invoices, and payment receipts for SPC's work for Edinger—Calkins signed a "Declaration for Authentication of Business Records" that facially complied with Rule 902(10)(B)'s requirements, and Edinger failed to show—through cross-examination or

---

[14]Edinger does not challenge the sufficiency of the notice of filing business records affidavit nor contend that he was not served with it before trial.

21

otherwise—that the records had been prepared in anticipation of litigation or were not regularly kept and relied upon by SPC in its ordinary course of activities. *See id.*; *see also Ortega v. Cach, LLC*, 396 S.W.3d 622, 629 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (explaining that the theory underlying the business-records exception is that there is a certain probability of trustworthiness of records regularly kept by an organization while engaged in its activities and upon which it relies in the ordinary course of its activities); *Dodeka, L.L.C. v. Campos*, 377 S.W.3d 726, 733 (Tex. App.—San Antonio 2012, no pet.) (op. on reh'g) (stating that document creator "must keep careful records of its customer's accounts" or risk business failure). The county court did not abuse its discretion by concluding that these business records were sufficiently authenticated and admissible.

Edinger points out that Calkins testified that there was no GPS tracking on SPC's pool trucks and that when Edinger asked him during cross-examination, "[I]s there any third-party verification that your employees are actually completing the work?" Calkins replied, "We don't need a third-[party] verification," and stated that SPC was not required to track its employees. Calkins further testified, however, that SPC's employees turned "in a route sheet that's completed and [if] a customer hasn't called for a complaint within two or three days of the service, then we have to assume that the[ir] job was completed." *See Dodeka*, 377 S.W.3d at 733. If a complaint came in, he would "fix it if [he could] or address it with the customer and find a solution." Calkins

22

stated that SPC based "everything off of their route sheets," which he prepared and printed off each week. *See id.*

The record reflects that during trial, Calkins laid the foundation for the admission of the business records that were not supported by his business records affidavit, *see* Tex. R. Evid. 803(6)(D), testifying that he had used Quickbooks to prepare the billing on Edinger's account, identifying the emails he had sent to Edinger with the invoices, identifying the invoice from Pool Water Products to SPC for the pool motors installed in Edinger's pool and billed to SPC before being billed to Edinger's account along with labor and tax, and identifying the SPC service and route sheets upon which the account billing was based.

Evidence is not misleading just because it does not support the opponent's view of the case, and alleged omissions or inaccuracies "typically go to the weight of the evidence, not its admissibility." *Diamond Offshore Servs. Ltd. v. Williams*, 542 S.W.3d 539, 550 (Tex. 2018). The county court did not abuse its discretion by admitting these exhibits, which it then had to evaluate in light of both parties' remaining evidence. We overrule these portions of Edinger's first and second issues.

### b. Docket management

In his fourth issue, Edinger argues that the county court erred by dismissing his counterclaims without a hearing on the merits and abused its discretion by denying his requested continuances. We will address these complaints together because they are inherently interrelated.

We begin with Edinger's counterclaim complaints. Edinger complains that he was "explicitly barred from presenting his counterclaims due to procedural limitations that were not caused by neglect or lack of diligence, but rather by systemic constraints, including a blocked e-filing system, a denied continuance despite valid grounds, and late access to key court documents and transcripts." He also complains that his counterclaims were dismissed without a hearing on the merits. The record, however, reflects Edinger's neglect and lack of diligence in attempting to bring his counterclaims before the county court.

A counterclaim is an original claim for relief, *see* Tex. R. Civ. P. 47, and as such, it must be filed to be considered. *See* Tex. R. Civ. P. 21. Further, parties may amend their filed pleadings "by filing such pleas with the clerk at such time as not to operate as a surprise to the opposite party; provided, that any pleadings . . . offered for filing *within seven days of the date of trial or thereafter . . .* shall be filed only after leave of the judge is obtained." Tex. R. Civ. P. 63 (emphasis added).

This simple bill-collection case began in justice court in 2022, during which time Edinger had the opportunity to obtain discovery regarding SPC's claims against him, to file a counterclaim, and to conduct discovery on his counterclaim. However, he did not follow the justice-court rules to file a counterclaim, and that claim was dismissed in the justice court's October 2022 judgment. Between March 30, 2023, when he answered SPC's amended petition, and March 29, 2024—when he tried to e-file his counterclaims

24

in the county court—and then between March 29, 2024, and September 5, 2024, from this record, Edinger took no other actions in the case.

Edinger refers us to *Griffin v. Illinois*, 351 U.S. 12, 76 S. Ct. 585 (1956), and *Boddie v. Connecticut*, 401 U.S. 371, 91 S. Ct. 780 (1971), but neither of these cases support his argument that he was entitled to a hearing on the merits before the county court dismissed his counterclaims. *Griffin*, an armed robbery case, is inapposite in that it stands for the proposition that, as a matter of due process and equal protection, indigent defendants are entitled to a free certified record for their first appeal. 351 U.S. at 13, 19, 76 S. Ct. at 588, 591. *Boddie*, a civil case in which welfare recipients brought a class action to assert that court fees and costs for divorce restricted their access to the courts, likewise has no bearing here because it turned, at least in part, on "the basic position of the marriage relationship in this society's hierarchy of values and the concomitant state monopolization of the means for legally dissolving this relationship." 401 U.S. at 372, 374, 91 S. Ct. at 783, 784. In *Boddie*, the Court observed that "[d]ue process does not, of course, require that the defendant in every civil case actually have a hearing on the merits." *Id.* at 378, 91 S. Ct. at 786.

The record reflects that Edinger did not file a counterclaim in the county court despite the county court's having advised him, when it heard his motion for continuance on September 18, that he still had time to file the counterclaim before the September 27 trial date. *See* Tex. R. Civ. P. 63. Edinger filed nothing despite the ability to file in-person instead of e-filing, and the county court could not have abused its discretion by

25

dismissing his counterclaim because there was nothing there to dismiss.  Because there was nothing to dismiss, the county court did not abuse its discretion by not holding a hearing on the merits—which otherwise would have been the September 27, 2024 trial if Edinger had filed his counterclaim.  We overrule this portion of Edinger's fourth issue.

Regarding Edinger's continuance complaints, when determining whether a court has abused its discretion by denying a continuance motion, we consider a variety of factors, including how long the case has been on file.  *Raoger Corp. v. Myers*, 711 S.W.3d 206, 215–16 (Tex. 2025).  If the continuance involves additional time for discovery, then we also consider the materiality and purpose of the discovery sought and whether the continuance-seeking party has exercised due diligence.  *Id.*

The record here reflects no abuse of discretion when, after Edinger corrected his initial motion for continuance by attaching an affidavit, *see* Tex. R. Civ. P. 251, he did not explain how email problems that he may have experienced between December 2023 and April 2024 had prevented him from discovering the rejected filings before September 5, 2024, or from contacting efiletexas.gov before September 5, 2024, for assistance.  Nor did he explain why he had failed to file any of his documents in person.  He also did not explain why he needed a sixty-day continuance and what "necessary" discovery he still required.  *Cf.* Tex. R. Civ. P. 252.  Edinger did not explain in his motion or affidavit how his lack of filed pleadings had "severely hindered [him] in conducting

26

meaningful discovery" when he had apparently been unaware of the rejection until September 5, 2024—six months after he had tried to file the pleadings.

On this record, we cannot say that the county court's denying Edinger's filed continuance motions—and, to the extent it considered his September 25 email another continuance motion and ruled on it[15]—was so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *See Raoger Corp.*, 711 S.W.3d at 216 (holding no abuse of discretion when the trial court could have appropriately found, in addition to the case's long pendency, that the movant did not exercise due diligence in obtaining discovery, particularly when movant failed to establish how further discovery would elicit any new and material evidence). We overrule the remainder of Edinger's fourth issue.

### 2. Legal sufficiency issues

In the remainder of his first issue, Edinger asserts that the evidence is legally insufficient when "[n]o written or oral contract was introduced into evidence establishing a legally enforceable obligation to continue services or make payment" and that SPC "conceded that no such agreement existed, rendering the award void under Tex. Bus. & Com. Code [Ann.] § 26.01(b)." In part of his second issue, he relies on his own evidence to suggest that the evidence supporting SPC's breach-of-contract claim

---

[15]The trial court's September 19, 2024 order stated that it considered Edinger's September 5, 2024 motion and his September 6, 2024 amended motion. The record does not contain what he emailed to the court coordinator on September 25 or a ruling on the record beyond the trial court's comments on September 27.

was insufficient and that "[n]o rational factfinder could have concluded that [SPC's] records were credible, much less legally sufficient." And in part of his third issue, he challenges the award of attorney's fees, asserting that SPC breached the contract and that SPC's counsel failed to support his testimony with billing statements under *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469 (Tex. 2019).

### a. Standard of review

Regarding Edinger's sufficiency challenges, in a trial to the court in which no findings of fact or conclusions of law are filed, the trial court's judgment implies all findings of fact necessary to support it. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017). But when—as here—a reporter's record is filed, these implied findings are not conclusive, and an appellant may challenge them by raising issues challenging the sufficiency of the evidence to support the judgment. *Id.* We apply the same standard when reviewing the sufficiency of the evidence to support implied findings that we use to review the evidentiary sufficiency of jury findings or a trial court's express findings of fact. *Id.* We must affirm the judgment if we can uphold it on any legal theory supported by the record. *Rosemond v. Al-Lahiq*, 331 S.W.3d 764, 766–67 (Tex. 2011).

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge— only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or

(4) the evidence establishes conclusively the opposite of a vital fact. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). In determining whether legally sufficient evidence supports the challenged finding, we must consider evidence favorable to the finding if a reasonable factfinder could, and we must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn*, 554 S.W.3d at 658 (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)). Anything more than a scintilla of evidence is legally sufficient to support a finding. *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727–28 (Tex. 2003).

More than a scintilla exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Gunn*, 554 S.W.3d at 658. On the other hand, no more than a scintilla exists when the evidence offered to prove a vital fact is so weak that it creates no more than a mere surmise or suspicion of its existence. *McAllen Hosps., L.P. v. Lopez*, 576 S.W.3d 389, 397 (Tex. 2019); *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). The factfinder—here, the county court—is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

### b. Breach of contract

Edinger argues that no written or oral contract was introduced into evidence to establish a legally enforceable obligation to continue services or make payment and that

29

Calkins conceded that no such agreement existed, rendering the award void under Business and Commerce Code Section 26.01(b).[16] We note ab initio that Edinger did not raise his Statute of Frauds argument in the county court, *see* Tex. R. App. P. 33.1, but even if he had raised it, Section 26.01(b) does not apply to the parties' month-to-month pool-cleaning agreement.[17]

To prevail on a breach-of-contract claim, a party must establish: (1) the existence of a valid contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff sustained damages from the defendant's breach. *Wood Care Ctrs., Inc. v. Evangel Temple Assembly of God of Wichita Falls, Tex.*, 307 S.W.3d 816, 824 (Tex. App.—Fort Worth 2010, pet. denied). The elements of a valid contract are as follows: (1) an offer; (2) an acceptance; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Rainier Southlake DST v. Woodbury Strategic Partners Fund, LP*, No. 02-16-00263-CV, 2017 WL 6047725, at *5 (Tex. App.—

---

[16]It is unclear whether Edinger is arguing that there was no contract between the parties at all or no agreement to continue pool services after April. Because the evidence shows—as discussed below—that the parties had an agreement and that they continued to perform after April, this lack of clarification does not matter for the disposition of this appeal.

[17]Section 26.01(a) states that a promise or agreement listed in Subsection (b) is not enforceable unless it is in writing and signed by the person to be bound or someone lawfully authorized to sign for him. Tex. Bus. & Com. Code Ann. § 26.01(a). Subsection (b) lists the types of agreements to which the requirement applies, *id.* § 26.01(b), none of which represented the parties' agreement.

Fort Worth Dec. 7, 2017, no pet.) (mem. op.); *see City of Houston v. Williams*, 353 S.W.3d 128, 137 (Tex. 2011) (explaining that multiple documents may comprise a written contract and that it is "well-established law that instruments pertaining to the same transaction may be read together to ascertain the parties' intent"); *Inimitable Grp., L.P. v. Westwood Grp. Dev. II, Ltd.*, 264 S.W.3d 892, 899 (Tex. App.—Fort Worth 2008, no pet.) (stating that "[t]he terms of an oral agreement may be established by direct or circumstantial evidence," and that in determining whether an oral contract exists, the court looks to the "communications between the parties and to the acts and circumstances surrounding those communications"); *see also Protect Env't Servs., Inc. v. Norco Corp.*, 403 S.W.3d 532, 542 (Tex. App.—El Paso 2013, pet. denied) ("Norco's silence and failure to object or refute the contract or the subsequent invoice can be shown as a manifestation of acceptance."); *Colvin v. Tex. Dow Emps. Credit Union*, No. 01-11-00342-CV, 2012 WL 5544950, at *7 (Tex. App.—Houston [1st Dist.] Nov. 15, 2012, no pet.) (mem. op.) (explaining that a signature is not an absolute requirement to show consent to a contract but rather that both consent and delivery may be established by the parties' acts or words showing that they intended the contract to become effective).

As shown by the evidence set out above and as discussed below, SPC established the existence of a valid contract, *see Rainier Southlake DST*, 2017 WL 6047725, at *5; *Protect Env't Servs., Inc.*, 403 S.W.3d at 542; *Colvin*, 2012 WL 5544950, at *7, and the county court was entitled to determine—based on the evidence presented by both

31

parties—whether SPC had performed each month and whether Edinger had breached the contract, or vice versa.

Calkins testified that the parties had entered into an oral agreement for weekly pool cleaning and maintenance, and the evidence established that Edinger and Calkins communicated both orally and in text messages about their agreement. *See Inimitable Grp., L.P.*, 264 S.W.3d at 899. SPC's invoices, some of which Edinger paid, also reflected the agreement's terms. *See City of Houston*, 353 S.W.3d at 137. Based on the evidence above, the fact question presented to the county court was not whether there was a valid and enforceable contract between the parties but rather who had breached it, when, and what damages were due.[18]

Edinger asserts that the county court could not have concluded that he breached the contract in light of his April 24, 2021 and April 29, 2021 photos of the pool's

---

[18]Edinger did not contest at trial that they had formed an agreement in December 2020. During his opening statement, he asserted that SPC had breached their agreement because it "did not do what [they had] verbally agreed to" and claimed that his pool had been "in disrepair for eleven months" because SPC had failed to perform. During his cross-examination of Calkins, Edinger asked, "You initially entered into a verbal agreement to clean and maintain our pool weekly, correct?" During his direct testimony, Edinger contended that his children had "lost use of this pool for 11 months" and that he was not obligated to pay "when the other party is in material breach."

Additionally, although Edinger complains in his reply brief that there was "[n]o evidence of delivery, installation, or connection" of the pump motors, Edinger cross-examined Calkins about this during trial, asking him about whether he had disclosed that the motors came from a wholesaler "when you brought it?" And the August 2021 texts admitted during Edinger's case in chief included the parties' discussion of the earlier "motor change on the filter pump."

32

condition and the April 24, 2021 text exchange in which he told Calkins that they "hadn't seen you guys in a couple of weeks." That is, he appears to argue that SPC failed to perform in April 2021 and thereby excused him from further performance. However, the remainder of that text exchange contained Calkins's excuse—storms for the last two Fridays and lots of windy days—and his technician's telling him that day that the pool cleaner did not seem to be working but that he would put that machine on his list of things to go check out. Instead of confronting the performance issue or terminating any future services from SPC, Edinger replied, "Awesome, thanks for the update."

Plaintiff's Exhibit 5 contained an April 7, 2021 invoice showing the monthly $165 charge for weekly pool cleaning plus tax and an additional $90 filter cleaning and is marked paid that day, but those services were performed in March. The May 2021 invoice showed billing for $178.61 for the April 2021 services. The judgment reflects that the county court deducted $178.61 from the $2,171.87 sought by SPC—the amount of one month's payment for weekly cleaning, which could have been for the May 2021 invoice or could have been for the amount of the excess charged for the pumps in June (the difference between the text stating that the new motors would be $640 "including tax and installation" and the billing that added charges for tax and installation), the April 7-billed filter cleaning, and the July service call. The county court had before it more than a scintilla of evidence to support the remaining months' performance if it found Calkins's testimony and SPC's documents credible, along with

33

portions of the Defense's text-message exhibits indicating that Calkins and SPC had performed. *See Golden Eagle Archery, Inc.*, 116 S.W.3d at 761.

Further, although Edinger produced two April 2021 photos to contest the pool's condition that month, he produced no evidence besides his testimony to show the pool's condition in May, June, July, August, September, October, and November, while SPC produced more than a scintilla of evidence to support its performance for each month. Although Edinger makes frequent references to the April 2021 photos as evidence of SPC's breach of contract, this contention is belied by his own text messages and SPC's documents showing that he made payments to SPC in August and September 2021.

The record reflects that the county court had more than a scintilla of evidence to support finding that Edinger breached the parties' contract: it had SPC's billing records and Calkins's testimony that SPC had performed as agreed, Edinger's two photos from April showing the pool's condition that month, Edinger's text messages showing that he had continued to interact with SPC instead of firing the company despite his concerns, and Edinger's testimony that he did not have to fire the company to stop it from billing him—testimony impliedly acknowledging that he had not terminated SPC's services. From this evidence, the county court could have reasonably found that Edinger had breached the contract by failing to pay for most of SPC's services through November and then determined the amount of SPC's damages from that evidence. We overrule this portion of Edinger's first issue.

34

### c. Attorney's fees

In part of his third issue, Edinger complains that because the county court's "entire award is premised on a tainted factual record, and the predicate for attorney's fees (a valid, enforceable agreement and successful claim under it) is absent, the [attorney's fee] award is unlawful and must be vacated." Based on our resolution above, the county court did not err by determining that Edinger—not SPC—had materially breached the contract. We overrule this portion of Edinger's third issue.

In the remainder of his third issue, Edinger asserts that SPC's counsel's testimony is insufficient to support the attorney's fee award because their "barter arrangement [was] never reduced to writing, not disclosed under oath prior to trial, and unsupported by time records or billing statements."

The supreme court updated the standard for attorney's-fee recovery in *Rorhmoos Venture*. *See generally* 578 S.W.3d at 487–505. In that case, the court explained that the amount incurred or contracted for "is not conclusive evidence of reasonableness or necessity," which the fee claimant has the burden to establish. *Id.* at 488. Reasonableness and necessity are fact questions for the factfinder. *Id.* at 489. When a statute, such as Section 38.001, does not contain an explicit requirement that fees be "incurred," we evaluate whether legally sufficient evidence supports that the amount awarded is reasonable and necessary for legal representation. *Id.*

In *Rohrmoos Venture*, the court took the lodestar method of determining attorney's fees and made it the standard "to apply to any situation in which an objective calculation

of reasonable hours worked times a reasonable rate can be employed." *Id.* at 498. "Sufficient evidence includes, at a minimum, evidence of (1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services." *Id.* The base lodestar calculation should reflect hours reasonably expended for services necessary to the litigation and a reasonable hourly rate for the attorney to prosecute or defend successfully against the claim at issue. *Id.* at 498–99. "[A] claimant seeking an award of attorney's fees must prove the attorney's reasonable hours worked and reasonable rate by presenting sufficient evidence to support the fee award sought." *Id.* at 501–02.

However, the court specifically stated that contemporaneous billing records were not required to prove that the requested fees were reasonable and necessary, although it strongly encouraged them "to prove the reasonableness and necessity of requested fees when those elements are contested." *Id.* at 502. This is because "[c]reating the documents makes them available for production, provides a basis for testifying as to the reasonableness and necessity of the requested fees, and permits cross-examination." *Id.* "Parties should use discovery and pretrial procedure to evaluate attorney's fee claims and the evidence supporting them, then present to the fact finder the evidence relevant to determining a reasonable and necessary fee as discussed in [*Rohrmoos*]." *Id.* at 503.

In *Rohrmoos Venture*, the attorney testified that he charged a standard rate of around $430 per hour and that a reasonable and necessary amount of hours in that

commercial breach-of-contract case would be between 750 and 1,000 hours in light of the extensive document review in the case, the depositions, deposition preparation, and other pretrial matters. *Id.* at 503–05. The supreme court held the evidence insufficient when the attorney did not provide more detail about the work done, how much time was spent on each task, and how he arrived at the $800,000 sum requested. *Id.* at 505; *see Nath v. Tex. Children's Hosp.*, 576 S.W.3d 707, 710 (Tex. 2019) ("Conclusory affidavits containing mere generalities about the fees for working on Nath's frivolous claims are legally insufficient to justify the sanction awarded here."). As part of its exercise of discretion, the court may consider the entire record and common knowledge of the participants as lawyers and judges in making its reasonableness-and-necessity determination. *Mogged v. Lindamood*, No. 02-18-00126-CV, 2020 WL 7074390, at *18 (Tex. App.—Fort Worth Dec. 3, 2020, pet. denied) (en banc mem. op. on reh'g).

Regarding the sufficiency of the evidence to support the reasonableness and necessity of conditional appellate attorney's fees, they "must be projected based on expert opinion testimony." *Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 355 (Tex. 2020). The party seeking to recover contingent appellate fees must provide opinion testimony about the services it reasonably believes will be necessary to defend the appeal and a reasonable hourly rate for those services. *Id.* And, as to appellate work, "all appeals involve researching, preparing, and drafting a brief, so remanding this case for a more specific description of particular services would provide little if any benefit." *Granbury SNF LLC v. Jackson*, No. 02-24-00248-CV, 2025 WL 807497, at *13 (Tex.

37

App.—Fort Worth Mar. 13, 2025, no pet.) (mem. op.) (quoting *Trujillo v. Shafaii Invs., Ltd.*, No. 01-22-00819-CV, 2024 WL 2001612, at *12 (Tex. App.—Houston [1st Dist.] May 7, 2024, pet. denied) (mem. op. on reh'g)).

In evaluating a conditional-appellate-attorney's-fee award in *Granbury SNF LLC*, we noted that our sister intermediate appellate court in the appeal underlying *Yowell* had held the conditional-appellate-fee evidence sufficient when the attorney testified that $22,000 would be a reasonable fee for handling the case through an appeal in the intermediate appellate court; $7,500 would be a reasonable fee for handling a petition for review to the supreme court; $9,000 would be a reasonable fee for briefing on the merits; and $5,000 would be a reasonable fee for representation through oral argument and completion of proceedings in the supreme court. *Id.* at *14 (citing *Yowell v. Granite Operating Co.*, 557 S.W.3d 794, 808 (Tex. App.—Amarillo 2018), *aff'd in part, rev'd in part*, 620 S.W.3d at 356). The supreme court affirmed that portion of our sister court's opinion, noting that "[h]aving independently reviewed the record," the uncontroverted evidence met the applicable standard. *Yowell*, 620 S.W.3d at 355; *see also Yowell*, 557 S.W.3d at 808 (noting that the other party did not cross-examine the attorney regarding his estimates for attorney's fees on appeal, present any additional evidence on the issue of appellate attorney's fees, or otherwise contest the testimony on what a reasonable fee would be in the appeal of that case); *cf. Granbury SNF LLC*, 2025 WL 807497, at *14 (observing that the appellate-attorney's-fee evidence was "at least as strong—if not stronger than—the evidence presented in *Yowell*," when the attorney testified about the

38

various stages of the appellate process and described some of the services for those stages instead of just providing a total amount of fees for each appellate-process stage).

SPC's counsel testified in support of his attorney's fees in the county court and his conditional appellate attorney's fees. He stated that he charged $250 an hour, which was "way under the market" for an attorney with "40-some-odd years of practice in the Dallas/Fort Worth area," and that Calkins had approached him in 2022 when the case "came out of the justice court." He testified that when Calkins asked him for help, he told Calkins he would offset his fees against SPC's $100 monthly charge to him for pool service. He then described the following services and charges:

- "An initial consult with Mr. Calkins, look at the documents, et cetera. I put down one hour for that."

- "The next thing I did was file various pleading in the county court, charged one hour for that."

- "And then over the course of the next year served some pretrial disclosures and had other various communications with Mr. Calkins and with the Court, charged $100 for that."

- "Prepared for trial in May of 2024, charge one hour for that."

- "I attended a mediation in this case a month ago. I charged one hour for that."

- "I spent considerable time dealing with the most recent Motion for Continuance and the hearings with the Court. I charged one hour for that."

- "I then prepared for this trial all of yesterday afternoon and a little bit of yesterday evening and charged three hours for that."

39

- "And then I've attended the trial today which I'm charging three hours for that."

Based on the above testimony, SPC's counsel billed eleven hours—$2,850—which is congruent with his summary that he decided to charge $2,500 "because that's how long Mr. Calkins has been cleaning my pool, more or less, about two years without charging me." He stated that he had not charged SPC for out-of-pocket costs or miscellaneous filing fees, and he opined that $2,500 was a reasonable fee for his services in the case, that they were necessary, and that the charges were customary for the area, albeit "way undercharged."

Regarding conditional appellate attorney's fees, SPC's counsel testified as follows:

> [I]f there's an appeal in this case, I estimate -- given the history of the litigious nature of this case, I estimate that there will be at least 20 hours spent in the Court of Appeals, which at $250 an hour is $5,000. And . . . [a] similar amount of $5,000 if the case is appeal[ed] to the Texas Supreme Court. Therefore, I am testifying that $2,500 in attorney fees for the trial court, $5,000 in attorney fees if this case is appealed to the Court of Appeals and $5,000 if this case is appealed to the Texas Supreme Court.

Edinger did not question SPC's counsel.

Although SPC's counsel did not submit his written contemporaneous billing records, he testified about the reasonableness and necessity of the fee request by stating his experience and hourly rate, the services that he performed, when the services were performed, and how much time he spent on them. *See Rohrmoos Venture*, 578 S.W.3d at 498. Edinger did not use discovery or pretrial procedure to evaluate these fee claims,

40

*cf. id.* at 503, he did not ask any questions of SPC's counsel when given the opportunity to cross-examine him, and he did not put on any controverting evidence as to either the reasonableness or necessity of the trial or conditional appellate attorney's fees. *See Yowell*, 620 S.W.3d at 355 (affirming conditional appellate-attorney's-fee award based on uncontroverted evidence). Because the county court had sufficient uncontroverted evidence upon which to determine a reasonable and necessary attorney's-fee award for the trial and conditional appellate attorney's fees that it awarded, we overrule Edinger's remaining issues.

## IV. Conclusion

Having overruled all of Edinger's issues, we affirm the county court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: August 21, 2025

41